Charity O'CONNELL (Gass), Plaintiff,

v.

LIBERTY MUTUAL INSURANCE COMPANY, Defendant.

Joan L. CHESCHEIR, Plaintiff,

v.

LIBERTY MUTUAL INSURANCE COMPANY, Defendant.

Civ. A. Nos. H–77–1109, H–77–1551.

United States District Court,
S. D. Texas,
Houston Division.

Sept. 25, 1980.

Carnegie H. Mims, Jr., Jefferson & Maley, John E. Schulman, Dixie, Wolf & Dixie, Houston, Tex., for plaintiff Charity O'Connell (Gass).

Andrew Gass, Houston, Tex., Kalvin M. Grove, P. Kevin Connelly, Michael R. Lewis, Lederer, Fox & Grove, Chicago, Ill., for defendant Liberty Mut. Ins.

Chris Dixie, Charles E. DeWitt, Jr., Dixie, Wolf & Hall, Houston, Tex., for plaintiff Joan L. Chescheir.

FINDINGS OF FACT AND
CONCLUSIONS OF LAW

McDONALD, District Judge.

This is a consolidated action under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e–2000e–17, as amended. The plaintiffs, Charity O'Connell (Gass) and Joan L. Chescheir, former employees of Liberty Mutual Insurance Company, the de-

fendant, contend that Liberty Mutual's "law school rule," which prohibits adjusters and first–year supervisors from attending law school, was discriminatorily applied on the basis of sex in the defendant's Southwest Division. The case was tried before the Court from February 19, 1980 through February 26, 1980. Nineteen (19) witnesses were called by the parties. On March 11, 1980, the case was reopened to allow the defendants to call two additional witnesses. A transcript was printed and extensive post–trial briefs were filed. The Court has now had a full opportunity to review the facts, the law, and the arguments of the parties. In accordance with Rule 52, Fed.R. Civ.P., it hereby enters the following Findings of Fact and Conclusions of Law.

## FINDINGS OF FACT

1. The plaintiffs, Charity O'Connell and Joan L. Chescheir, are white females, citizens of the United States, and residents of Harris County, Texas.

2. The defendant, Liberty Mutual Insurance Company, is a casualty insurance company which does business in the state of Texas and the city of Houston and has offices throughout the country. It is an employer within the meaning of 42 U.S.C. § 2000e(b).

3. Plaintiff O'Connell filed a charge of discrimination, under oath, with the Equal Employment Opportunity Commission on October 20, 1976, naming the defendant as respondent. On November 12, 1976, plaintiff Chescheir filed a similar charge. The Equal Employment Opportunity Commission conducted a joint investigation of the plaintiffs' allegations. On April 26, 1977, it determined that there was reasonable cause to believe that Title VII of the Civil Rights Act of 1964 had been violated. Approximately two months later, on June 22, 1977, it issued a Notice of Right to Sue Within Ninety Days to both plaintiffs. On July 13, 1977, and September 19, 1977, respectively, plaintiff O'Connell and plaintiff Chescheir filed suit in federal district court. Their actions were consolidated, by order of the Court, on July 2, 1979.

4. Liberty Mutual Insurance Company has a rule prohibiting its adjusters and first–year supervisors from attending law school. This "law school rule" was proposed and implemented on a nationwide basis by Mr. Edmund A. Carr, Vice President and Home Office Assistant General Claims Manager for Liberty Mutual, in November, 1972. Prior to that time, "[s]ome of the [defendant's] nine claims divisions already had rules or policies in effect. . . . The Southwest Division [which encompasses seven states, including Texas, Arkansas, and Louisiana] was one of those divisions . . . Since sometime in the middle 1960's, adjusters and first–year supervisors in the Southwest Division had to choose between law school [and] Liberty Mutual." *Defendant's Post–trial Brief*, at 3, 11. It is the application of the defendant's law school rule in the Southwest Division that is at issue in the present case.

5. Plaintiff Joan Chescheir was first hired by Liberty Mutual in March, 1973, as a claims adjuster in the Dallas office. In January, 1975, she voluntarily resigned. Five months later, in June, 1975, she sought employment in the defendant's Houston office. She was hired, once again, as a claims adjuster. A few months later, in the fall of 1975, plaintiff Chescheir entered law school.

6. The following year, on Thursday, August 26, 1976, Mr. Wyatt Trainer, Claims Manager of the defendant's Houston office, received an anonymous letter informing him that Ms. Chescheir was attending law school. *See* Defendant's Exhibit 62. After consulting with his assistants and superior, Mr. Trainer confronted Ms. Chescheir. She admitted that she was going to law school. He informed her that she could not attend law school and continue to work at Liberty Mutual. She refused to give up law school. Consequently, on Friday, August 27, 1976, plaintiff Chescheir was constructively discharged.

7. Plaintiff Charity O'Connell was hired by Liberty Mutual as a claims adjuster in the Houston office in November, 1975. While working for Liberty Mutual, plaintiff O'Connell attended law school. On Septem-

ber 20, 1976, plaintiff O'Connell took a coffee break with Ms. Sue Smith, a fellow adjuster, Ms. Carolyn Bailey, a supervisor, and Mr. Timothy Schwirtz, a new adjuster. It is not clear whether Ms. Shirley Cole, another supervisor at Liberty Mutual, also took part in the coffee break. It was Mr. Schwirtz's first day on the job. When Joan Chescheir's name came up in the conversation, he asked who she was. It was explained to Mr. Schwritz that Joan Chescheir was a former adjuster who had been fired for going to law school. According to plaintiff O'Connell, Mr. Schwirtz then said, "Oh, that's strange, because when I was hired, when [Charles S.] Wells [Southwest Division Claims Manager] interviewed me, he told me that I could go to law school and in fact if I came down to the Houston office, there were law schools in Houston." Tr. at 287.

8. Plaintiff O'Connell testified that she was "shocked" by this revelation and became "rather angry." Tr. at 288–289. After the coffee break was over, she confronted Mr. Terry Hickman, her supervisor. She related her conversation with Mr. Schwirtz to Mr. Hickman. She said that it was unfair: Joan Chescheir had been fired for going to law school, yet Tim Schwirtz had been told that he could go to law school. She told Mr. Hickman that she, like Joan Chescheir, was presently attending law school and that if Liberty Mutual fired her, it would be discriminating on the basis of sex.

9. Mr. Hickman relayed this information to Mr. Wyatt Trainer, Houston Office Claims Manager, who had confronted Ms. Chescheir. *See* Finding of Fact 6. Mr. Trainer did not speak with Mr. Wells or Mr. Schwirtz to determine if Mr. Wells had, in fact, told Mr. Schwirtz that he could go to law school. He did, however, speak with plaintiff O'Connell. He informed her that she had to either quit law school or leave Liberty Mutual. Plaintiff O'Connell refused to quit law school. She was, therefore, fired that afternoon.

10. As the defendant states in its post-trial brief, at 2, "this is essentially a one issue case: whether the defendant applied the [law school] rule equally to male[s] and female[s]." The plaintiffs allege that Liberty Mutual allowed at least three male employees–William McCarthy, Alvin Dwayne White, and James Ballard–to attend law school while working as adjusters or first–year supervisors. The defendant denies this allegation.

11. Mr. William McCarthy was hired as a claims adjuster in Liberty Mutual's Houston office in May, 1971. Four months later, in September, 1971, Mr. McCarthy entered law school. Mr. McCarthy continued to work as an adjuster in Liberty Mutual's office and attend law school until January, 1974. At that time, he left Liberty Mutual to attend law school full time.

12. Mr. McCarthy is an extremely engaging individual. He was, and is, well thought of in the defendant's Houston office. As Mr. Wyatt Trainer, Houston Office Claims Manager from January, 1969, through November, 1976, explained it, "[H]e was a character, and he was unusual, and he was a fellow who intrigued me and others. He had what I thought to be a lot of possibilities and potential." Tr. at 432. One factor contributing to the high regard in which Mr. McCarthy was held was his ability to demonstrate and utilize advanced legal knowledge. For example, in early 1973, Mr. McCarthy handled a claim by the Humble Oil Company involving a punctured pipeline. He was taking property law at the time and managed to minimize the amount paid by Liberty Mutual by arguing with Humble Oil's attorney about "estoppel by deed and privity of estate." Mr. McCarthy wrote a memorandum about these negotiations which discussed the legal arguments employed and explained how vindication of the position he had taken would require that a substantial amount of Texas case law be overruled. Both the policy holder and Mr. McCarthy's superiors were extremely impressed. Mr. Richard Kreuger, one of two assistant claims managers in the Houston office, was particularly enthusiastic about the memorandum. He complimented Mr. McCarthy on it and

praised it to Mr. Charles Neathery, the other assistant claims manager in the Houston office. In addition, he asked Mr. McCarthy how he knew this information. Mr. McCarthy summarized his response, Tr. at 168, as follows:

I had indicated, well, I had performed a proctorship in Pennsylvania which has a requirement that you become an involuntary servant for six months before you take the bar, and I had completed three months of my proctorship while in undergraduate school and covered myself that way.

And he accepted that. So I say that my star rose some because of that particular memo, and that particular case.

13. Throughout 1973, Mr. McCarthy worked on a claim involving the loss of an arm in a bakery machine. During that time, he contacted Mr. Walter Workman, an outside attorney handling the case, to discuss the factual and legal developments surrounding the claim. Mr. McCarthy suggested to Mr. Workman that the California doctrine of "inattentive peril," a spinoff of the doctrine of "discovered peril," might be applicable to the case. According to Mr. McCarthy, Tr. at 182,

Mr. Workman said in Texas it's the doctrine of forseeable misuse, but you have a point there, and we kicked around contributory negligence to the extent the plaintiff's case was sounding in negligence and the assumption of risk to the extent it was carrying over into products, and at that time, of course, negligence was also—could also be a defense. Negligent misuse to a products case is a complete defense. So we had a conversation that, you know, got some fairly heavy legal theorizing on that particular file.

The conversation prompted Mr. Workman to call Mr. Neathery. During that telephone conversation, Mr. Workman told Mr. Neathery that he and Mr. McCarthy had had a discussion about the claim and that Mr. McCarthy had cited a fair amount of case law. Mr. Neathery told Mr. Workman that Mr. McCarthy was in law school, and that he was going to leave the company to attend law school full time. It is not clear when this conversation took place. Mr. Workman placed it in 1974 or 1975, but that is also when he said he first became acquainted with Mr. McCarthy. Independent evidence established that Mr. McCarthy and Mr. Workman actually had their discussion involving "some fairly heavy legal theorizing" in August or September, 1973.

14. Given the above, it is not surprising that, as Mr. Walter Smith testified, Mr. McCarthy was well known at Liberty Mutual for his legalistic reports. Tr. at 538. Mr. Smith was a supervisor in Liberty Mutual's Houston office for a portion of the time during which Mr. McCarthy served as an adjuster and attended law school. He admitted that it was rumored, at that time, that Mr. McCarthy was attending law school. Tr. at 536. Having had an opportunity to observe his demeanor on the witness stand, the Court is convinced that Mr. Smith knew, while he was a supervisor in the Houston office, that Mr. McCarthy was attending law school.

15. The Court is also convinced that Mr. Richard Krueger, the assistant claims manager in the Houston office who was so enthusiastic about Mr. McCarthy's pipeline memo, knew that Mr. McCarthy was attending law school while working as an adjuster. Mr. Charles Neathery, the other assistant claims manager, and Mr. Wyatt Trainer, the Houston Office Claims Manager, at a minimum, suspected that Mr. McCarthy was attending law school, but preferred not to ask and confirm their suspicions.

16. When Mr. McCarthy left Liberty Mutual to become a full–time law student, he made it clear that he had, in fact, been attending law school while working as an adjuster. Even so, in July, 1975, when Mr. McCarthy completed law school, he was actually retained by Liberty Mutual as house counsel in its Houston office. From July, 1975, on, this was common knowledge in the defendant's Houston office.

17. Mr. Alvin Dwayne White was hired as an adjuster in Liberty Mutual's Fort Worth office in the fall of 1973. Early in

1974, Mr. White decided that he wanted to transfer to Liberty Mutual's Houston office, in part, to attend law school. He expressed that desire to one or more of his superiors. Sometime thereafter, most likely in March or April, 1974, one of Mr. White's superiors discussed the matter with Mr. Charles S. Wells, Claims Manager of Liberty Mutual's Southwest Division. Knowing that Mr. White wanted to attend law school while working as an adjuster in Houston, Mr. Wells approved his transfer. In late August or early September, 1974, Mr. White did, in fact, transfer to the defendant's Houston office. In September, 1974, while working as an adjuster in that office, he entered law school. Three months later, in December, 1974, Mr. White left Liberty Mutual.

18. Shortly after approving Mr. White's transfer, Mr. Wells received a memorandum from Mr. Edmund A. Carr, Liberty Mutual Vice President and Home Office Assistant Claims Manager. It was Mr. Carr's responsibility to implement the nationwide law school rule adopted by Liberty Mutual in November 1972. *See* Finding of Fact 4. The memorandum, Defendant's Exhibit 13, dated April 26, 1974, read as follows:

TO: DIVISION CLAIMS MANAGERS
RE: *ATTENDANCE AT LAW SCHOOL*
Will each of you please report as to whether we are continuing, without fail, to tell new adjusters either when they are applicants or at the moment of hire, that attendance at law school while they are adjusters or during the first year they are supervisors will be grounds for dismissal from the company.

This memorandum was not prompted by Mr. Wells's approval of Mr. White's transfer. It was, however, the first written communication between the Home Office and the Southwest Division in regard to the law school rule. Mr. Wells's response to the memorandum, Defendant's Exhibit 24, a letter to Mr. Carr, is dated April 29, 1974. The text of the letter is as follows:

Mr. Armstrong [Southwest Division Assistant Claims Manager] assures me that he is telling every applicant whom he sees after they've reached the point where we are interested in offering them the job that attendance at law school under the terms of your memo of April 26, 1974, is grounds for dismissal.

I must admit that I did not realize that this was an ironclad rule. As a matter of fact, I have recently discussed the possibility of transferring a young black adjuster from Fort Worth to a city which had a night law school he could afford. I was rationalizing the fact that we probably could assure ourselves of two years' use of an excellent adjuster, perhaps more if law school turned out not to be to his liking. We shall retract that discussion immediately and will make certain that we follow the letter of the rule in the future.

Mr. Wells may or may not have retracted the discussion he had regarding Mr. White's transfer. Mr. White, however, was permitted to transfer. Moreover, after he asked for his transfer, no one ever told him that he could not work as an adjuster and go to law school.

19. Mr. Wells's testimony, it should be noted, does not comport with this recitation of events. For example, Mr. Wells testified that the discussion of Mr. White's transfer referred to in his April 29, 1974, letter to Mr. Carr took place directly between him and Mr. White, not one of Mr. White's superiors. Tr. at 650. The terms of the letter, however, indicate that Mr. Wells did not speak directly to Mr. White in regard to the latter's transfer. Mr. White, moreover, could not recall ever having spoken to Mr. Wells about going to law school. It is more likely than not that, if Mr. White had spoken to Mr. wells about going to law school, he would remember it. At the time, Mr. White was a first–year claims adjuster in Liberty Mutual's Fort Worth office; Mr. Wells was the Claims Manager of the entire Southwest Division. Mr. Wells also testified that, when he originally discussed Mr. White's transfer, he did not approve it, he only indicated that he would see whether it was possible. Tr. at 647, 650. His letter to Mr. Carr, however, clearly shows that Mr.

Wells thought it necessary to "retract" that original discussion. Mr. Wells further testified that he knew the law school rule was to be enforced without exception, but he was not sure whether it applied to Mr. White. Mr. White is black. Mr. Wells said that he knew that Liberty Mutual had a policy favoring affirmative action in the hiring of minorities and that he wrote to Mr. Carr on April 29, 1974, to determine whether the rule or the policy was predominant. Tr. at 647–648. In his letter, however, Mr. Wells said, "I must admit that I did not realize that this was an ironclad rule." The letter, in addition, contains no mention of affirmative action. Nor does it contain an inquiry as to whether the law school rule predominates over any other Liberty Mutual policy. Mr. Wells's testimony, in and of itself and when viewed in the context of the other evidence, both testimonial and documentary, introduced before the Court, is simply unbelievable.

20. Mr. White's superiors, including Mr. Wells, the Claims Manager of Liberty Mutual's entire Southwest Division, knew that Mr. White wanted to transfer to Houston, in part, to attend law school while working as an adjuster. They did not tell him that he could not do so. To the contrary, they approved his transfer. They were fully aware that Mr. White, while working as an adjuster in the Houston office, was attending law school.

21. Mr. James Ballard began working as an adjuster in Liberty Mutual's Houston office in July, 1973. In September, 1975, Mr. Ballard entered law school. He continued to work as an adjuster. In March, 1977, while still in law school, Mr. Ballard was promoted to supervisor.

22. As numerous witnesses, including Mr. Charles Wells, Southwest Division Claims Manager, and Mr. Larry Ogletree, presently Southwest Division Assistant Claims Manager, testified without contradiction, supervisors at Liberty Mutual were members of management. It was their responsibility to enforce the law school rule. Mr. Ballard, of course, did not enforce the rule against himself.

23. In October or November, 1975, soon after Mr. Ballard entered law school, Ms. Shirley Cole and Mr. Gary Ball, adjusters at Liberty Mutual's Houston office, learned of Mr. Ballard's law school attendance. Ms. Cole and Mr. Ballard were dating at the time. She told no one of Mr. Ballard's law school attendance. Mr. Ball, on the other hand, did pass the information on to other individuals. As a result of Mr. Ball's statements, in December, 1975, or January, 1976, Mr. John Bedingfield, a supervisor in Liberty Mutual's Houston office, learned that Mr. Ballard was attending law school. Mr. Bedingfield did nothing to see that the law school rule was enforced against Mr. Ballard.

24. In February, 1976, Mr. Ball was promoted to the position of supervisor. He also did nothing to see that the law school rule was enforced against Mr. Ballard.

25. By March or April, 1976, it was rumored throughout Liberty Mutual's Houston office that Mr. Ballard was going to law school. He was not, however, questioned about his law school attendance.

26. In early 1977, Mr. Ballard was interviewed by the Equal Employment Opportunity Commission in accordance with its investigation of the charges filed by the plaintiffs in the present case. He admitted to the EEOC investigator that he was attending law school. On April 7, 1977, Mr. John J. Kramer, Equal Opportunity Specialist for the Equal Employment Opportunity Commission, contacted Mr. Robert A. Penney, Assistant Vice President and Counsel for Liberty Mutual, by mail. In his letter, Mr. Kramer wrote as follows:

[D]uring the course of this investigation it has been discovered that on at least one occasion a male adjuster with the organization was allowed, with managements [sic] knowledge, to attend night law school.

Please supply this office a detailed explanation of the reasons for this difference in treatment of male and female adjusters within five (5) days of your receipt of this letter.

Mr. Penney did not offer Mr. Kramer an explanation. Nor did he conduct any investigation to determine which individual was spoken of in Mr. Kramer's letter. His response to Mr. Kramer, dated April 12, 1977, said:

It is impossible for me to respond fully unless you are willing to give me the name of the male adjuster who is allegedly allowed to attend night law school together with the name or names of the individuals in management who allegedly had knowledge of this fact.

Upon receipt of this information, I will look into the details and respond promptly.

27. In May, 1977, Ms. Shirley Cole was promoted to the position of supervisor. She and Mr. Ballard were still dating. Ms. Cole took no action to see that the law school rule was enforced in regard to Mr. Ballard.

28. On November 29, 1977, counsel for plaintiff Chescheir mailed a set of interrogatories to counsel for the defendant. Interrogatory No. 13 asked whether Mr. James Ballard had ever attended law school while classified as an adjuster. One and a half months later, on January 12, 1978, Mr. Wells, Southwest Division Claims Manager, called Mr. Larry Ogletree, then Houston Claims Manager, and instructed him to ask Mr. Ballard whether he had attended law school and to discharge him if he admitted having done so. When Mr. Ogletree questioned Mr. Ballard, Mr. Ballard said that he was attending law school, that it was currently between semesters, and that he intended to return to school when the new semester began. Mr. Ballard was, at that time, fired.

29. The defendant acknowledges that Mr. McCarthy, Mr. White, and Mr. Ballard went to law school while working as adjusters and, in Mr. Ballard's case, a first–year supervisor. *Defendant's Post–trial Brief*, at 29. It explains its failure to investigate the rumors of their law school attendance as follows:

The Company does not use Gestapo–type techniques to uncover these rule–breakers. It does not search people's belong-

ings for law books and it does not conduct wholesale interrogations.

*Id.* It similarly accounts for its unwillingness to determine which male employee was referred to in Mr. Kramer's letter of April 7, 1977. *See* Finding of Fact 26. "[T]he Company," the defendant says in its post–trial brief, at 55–56, "hires high caliber individuals, respects them and treats them as professionals, and is not in the habit of conducting witch hunts."

30. There is some question as to whether this explanation, if it were an accurate description of Liberty Mutual's conduct, would be acceptable. It is not, however, an accurate description of Liberty Mutual's conduct. One individual was interrogated by Liberty Mutual: Ms. Sue Smith. Ms. Smith was an adjuster in the defendant's Houston office from November, 1974, to October, 1976. When plaintiff Chescheir was terminated, on August 27, 1976, *see* Finding of Fact 6, the defendant did not question Mr. Ballard about his law school attendance, despite the fact that it was rumored throughout the office that Mr. Ballard was going to law school. It did, however, question Ms. Smith. Within a week of plaintiff Chescheir's termination, Ms. Smith was questioned both by Ms. Carolyn Bailey, a supervisor in the Houston office, and by Mr. Wyatt Trainer, Claims Manager of the Houston office, as to whether she was in law school or intending to attend law school. The defendant gave no explanation for this activity. It did not even allege that it was "rumored" that Ms. Smith was attending law school. Ms. Smith, it appears, was suitable for questioning because she is a woman.

31. The defendant knew that two females, plaintiffs Chescheir and O'Connell, were attending law school in violation of the law school rule. It terminated their employment. It also knew that three males, Mr. McCarthy, Mr. White, and Mr. Ballard, were attending law school in violation of the law school rule. It did not terminate their employment. In fact, the defendant transferred Mr. White from Fort Worth to Houston to enable him to go to

law school. Finally, despite the rumors of Mr. McCarthy's law school attendance, the rumors of Mr. Ballard's law school attendance, and the receipt of a letter from the EEOC indicating that a male adjuster at Liberty Mutual was attending law school, the defendant did not question a single male employee as to whether he was attending law school. It did, however, when it learned that one female adjuster, plaintiff Chescheir, was attending law school, immediately question another female adjuster, Ms. Sue Smith, as to whether she was attending law school or even contemplating attending law school.

32. The defendant applied its law school rule differently to male and female employees. It offered no justification for that disparate treatment. That being so, it discriminated on the basis of sex against both plaintiff O'Connell and plaintiff Chescheir in violation of 42 U.S.C. § 2000e–2(a)(1).

### CONCLUSIONS OF LAW

1. Jurisdiction in this Court is proper pursuant to 28 U.S.C. § 1343. Venue is not disputed.

2. The plaintiffs met the timeliness requirements of Title VII. Each filed her charge of discrimination with the Equal Employment Opportunity Commission within 180 days of the date of the alleged acts of discrimination, 42 U.S.C. § 2000e–5(e), and filed her complaint in federal district court within 90 days of receipt of her Notice of Right to Sue. 42 U.S.C. § 2000e–5(f)(1). All issues discussed in this opinion are like or related to those raised in the plaintiffs' EEOC charges and are within the scope of the investigation which could reasonably have been expected to grow out of those charges. *Sanchez v. Standard Brands, Inc.*, 431 F.2d 455, 466 (5th Cir. 1970).

3. By applying its law school rule differently to men and women without justification, the defendant violated 42 U.S.C. § 2000e–2(a)(1). *See International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977). As the United States Supreme Court stated in that case, at 335–336 n.15, 97 S.Ct. at 1854–55 n.15, "disparate treatment was the most obvious evil Congress had in mind when it enacted Title VII."

4. The plaintiffs are entitled to all lost wages, *Albemarle Paper Company v. Moody*, 422 U.S. 405, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975), appropriate equitable relief, and, according to the guidelines set out in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir. 1974), attorneys' fees. 42 U.S.C. § 2000e–5. The parties will have thirty (30) days to submit to the Court an agreed order outlining the relief to be granted in the present case. If they are unable to come to an agreement by that time, a hearing to determine the appropriate relief will be set.

5. In the event that any of the foregoing Findings of Fact also constitute Conclusions of Law, they are adopted as such. In the event that any of the foregoing Conclusions of Law also constitute Findings of Fact, they are adopted as such.