Joan L. CHESCHEIR and Charity O'Connell (Gass), Plaintiffs-Appellees,

v.

LIBERTY MUTUAL INSURANCE COMPANY, Defendant-Appellant.

No. 82–2350.

United States Court of Appeals, Fifth Circuit.

Sept. 6, 1983.

Kalvin M. Grove, Paul R. Garry, Steven P. Cohn, Chicago, Ill., for defendant-appellant.

Jefferson, Sherman & Mims, Carnegie H. Mims, Jr., Houston, Tex., for O'Connell.

Dixie, Wolf & Dixie, John E. Schulman, Chris Dixie, Houston, Tex., for Cheschier.

Before CLARK, Chief Judge, GOLDBERG and POLITZ, Circuit Judges.

GOLDBERG, Circuit Judge:

· Plaintiffs Chescheir and O'Connell, both women, claimed that defendant Liberty Mutual Insurance Co. ("Liberty Mutual") wrongfully discharged them by discriminatory application of its "law school rule," which prohibits certain employees from attending law school. After a bench trial, the district court found that Liberty Mutual did discriminatorily apply the law school rule against women in violation of Title VII, 42 U.S.C. § 2000e–2(a)(1) (1976), and awarded damages and attorneys' fees. Liberty Mutual now appeals, arguing that the factual

findings supporting liability, damages, and attorneys' fees are clearly erroneous. Finding sufficient evidence in the record to support the district court's findings, we affirm.

## I. INTRODUCTION

### A. Facts

This case is before us essentially as a factual dispute. Though we recognize that Liberty Mutual hotly disputes some of the district court's findings, we shall liberally quote from them to establish a factual predicate for our discussion:

4. Liberty Mutual Insurance Company has a rule prohibiting its adjusters and first-year supervisors from attending law school. This "law school rule" was proposed and implemented on a nationwide basis by Mr. Edmund A. Carr, Vice President and Home Office Assistant General Claims Manager for Liberty Mutual, in November, 1972. Prior to that time, "[s]ome of the [defendant's] nine claims divisions already had rules or policies in effect.... The Southwest Division [which encompasses seven states, including Texas, Arkansas, and Louisiana] was one of those divisions... Since sometime in the middle 1960's, adjusters and first-year supervisors in the Southwest Division had to choose between law school [and] Liberty Mutual." *Defendant's Post-trial Brief,* at 3, 11. It is the application of the defendant's law school rule in the Southwest Division that is at issue in the present case.

5. Plaintiff Joan Chescheir was first hired by Liberty Mutual in March, 1973, as a claims adjuster in the Dallas office. In January, 1975, she voluntarily resigned. Five months later, in June, 1975, she sought employment in the defendant's Houston office. She was hired, once again, as a claims adjuster. A few months later, in the fall of 1975, plaintiff Chescheir entered law school.

6. The following year, on Thursday, August 26, 1976, Mr. Wyatt Trainer, Claims Manager of the defendant's Houston office, received an anonymous letter informing him that Ms. Chescheir was attending law school. *See* Defendant's Exhibit 62. After consulting with his assistants and superior, Mr. Trainer confronted Ms. Chescheir. She admitted that she was going to law school.

He informed her that she could not attend law school and continue to work at Liberty Mutual. She refused to give up law school. Consequently, on Friday, August 27, 1976, plaintiff Chescheir was constructively discharged.

7. Plaintiff Charity O'Connell was hired by Liberty Mutual as a claims adjuster in the Houston office in November, 1975. While working for Liberty Mutual, plaintiff O'Connell took a coffee break with Ms. Sue Smith, a fellow adjuster, Ms. Carolyn Bailey, a supervisor, and Mr. Timothy Schwirtz, a new adjuster. It is not clear whether Ms. Shirley Cole, another supervisor at Liberty Mutual, also took part in the coffee break. It was Mr. Schwirtz's first day on the job. When Joan Chescheir's name came up in the conversation, he asked who she was. It was explained to Mr. Schwirtz that Joan Chescheir was a former adjuster who had been fired for going to law school. According to plaintiff O'Connell, Mr. Schwirtz then said, "Oh, that's strange, because when I was hired, when [Charles S.] Wells [Southwest Division Claims Manager] interviewed me, he told me that I could go to law school and in fact if I came down to the Houston office, there were law schools in Houston." Tr. at 287.

8. Plaintiff O'Connell testified that she was "shocked" by this revelation and became "rather angry." Tr. at 288–289. After the coffee break was over, she confronted Mr. Terry Hickman, her supervisor. She related her conversation with Mr. Schwirtz to Mr. Hickman. She said that it was unfair: Joan Chescheir had been fired for going to law school, yet Tim Schwirtz had been told that he could go to law school. She told Mr. Hickman that she, like Joan Chescheir, was presently attending law school and that if Liberty Mutual fired her, it would be discriminating on the basis of sex.

9. Mr. Hickman relayed this information to Mr. Wyatt Trainer, Houston Office Claims Manager, who had confronted Ms. Chescheir. *See* Finding of Fact 6. Mr. Trainer did not speak with Mr. Wells or Mr. Schwirtz to determine if Mr. Wells had, in

fact, told Mr. Schwirtz that he could go to law school. He did, however, speak with plaintiff O'Connell. He informed her that she had to either quit law school or leave Liberty Mutual. Plaintiff O'Connell refused to quit law school. She was, therefore, fired that afternoon.

10. As the defendant states in its post-trial brief, at 2, "this is essentially a one issue case: whether the defendant applied the [law school] rule equally to male[s] and female[s]." The plaintiffs allege that Liberty Mutual allowed at least three male employees—William McCarthy, Alvin Dwayne White, and James Ballard—to attend law school while working as adjusters or first-year supervisors. The defendant denies this allegation.

11. Mr. William McCarthy was hired as a claims adjuster in Liberty Mutual's Houston office in May, 1971. Four months later, in September, 1971, Mr. McCarthy entered law school. Mr. McCarthy continued to work as an adjuster in Liberty Mutual's office and attend law school until January, 1974. At that time, he left Liberty Mutual to attend law school full time.

[Findings 12 and 13 relate Mr. McCarthy's notoriety for including detailed legal analyses in his claim reports.]

14. Given the above, it is not surprising that, as Mr. Walter Smith testified, Mr. McCarthy was well known at Liberty Mutual for his legalistic reports. Tr. at 538. Mr. Smith was a supervisor in Liberty Mutual's Houston office for a portion of the time during which Mr. McCarthy served as an adjuster and attended law school. He admitted that it was rumored, at that time, that Mr. McCarthy was attending law school. Tr. at 536. Having had an opportunity to observe his demeanor on the witness stand, the Court is convinced that Mr. Smith knew, while he was a supervisor in the Houston office, that Mr. McCarthy was attending law school.

15. The Court is also convinced that Mr. Richard Krueger, the assistant claims manager in the Houston office who was so enthusiastic about Mr. McCarthy's pipeline memo, knew that Mr. McCarthy was attending law school while working as an adjuster. Mr. Charles Neathery, the other assistant claims manager, and Mr. Wyatt Trainer, the Houston Office Claims Manager, at a minimum, suspected that Mr. McCarthy was attending law school, but preferred not to ask and confirm their suspicions.

16. When Mr. McCarthy left Liberty Mutual to become a full-time law student, he made it clear that he had, in fact, been attending law school while working as an adjuster. Even so, in July, 1975, when Mr. McCarthy completed law school, he was actually retained by Liberty Mutual as house counsel in its Houston office. From July, 1975, on, this was common knowledge in the defendant's Houston office.

17. Mr. Alvin Dwayne White was hired as an adjuster in Liberty Mutual's Fort Worth office in the fall of 1973. Early in 1974, Mr. White decided that he wanted to transfer to Liberty Mutual's Houston office, in part, to attend law school. He expressed that desire to one or more of his superiors. Sometime thereafter, most likely in March or April, 1974, one of Mr. White's superiors discussed the matter with Mr. Charles S. Wells. Claims Manager of Liberty Mutual's Southwest Division. Knowing that Mr. White wanted to attend law school while working as an adjuster in Houston, Mr. Wells approved his transfer. In late August or early September, 1974, Mr. White did, in fact, transfer to the defendant's Houston office. In September, 1974, while working as an adjuster in that office, he entered law school. Three months later, in December, 1974, Mr. White left Liberty Mutual.

[Findings 18 and 19 detail correspondence and testimony regarding whether Mr. Wells ever told Mr. White that he could not attend law school.]

20. Mr. White's superiors, including Mr. Wells, the Claims Manager of Liberty Mutual's entire Southwest Division, knew that Mr. White wanted to transfer to Houston, in part, to attend law school while working as an adjuster. They did not tell him that he could not do so. To the contrary, they approved his transfer. They were fully

aware that Mr. White, while working as an adjuster in the Houston office, was attending law school.

21. Mr. James Ballard began working as an adjuster in Liberty Mutual's Houston office in July, 1973. In September, 1975, Mr. Ballard entered law school. He continued to work as an adjuster. In March, 1977, while still in law school, Mr. Ballard was promoted to supervisor.

22. As numerous witnesses, including Mr. Charles Wells, Southwest Division Claims Manager, and Mr. Larry Ogletree, presently Southwest Division Assistant Claims Manager, testified without contradiction, supervisors at Liberty Mutual were members of management. It was their responsibility to enforce the law school rule. Mr. Ballard, of course, did not enforce the rule against himself.

23. In October or November, 1975, soon after Mr. Ballard entered law school, Ms. Shirely Cole and Mr. Gary Ball, adjusters at Liberty Mutual's Houston office, learned of Mr. Ballard's law school attendance. Ms. Cole and Mr. Ballard were dating at the time. She told no one of Mr. Ballard's law school attendance. Mr. Ball, on the other hand, did pass the information on to other individuals. As a result of Mr. Ball's statements, in December, 1975, or January, 1976, Mr. John Bedingfield, a supervisor in Liberty Mutual's Houston office, learned that Mr. Ballard was attending law school. Mr. Bedingfield did nothing to see that the law school rule was enforced against Mr. Ballard.

24. In February, 1976, Mr. Ball was promoted to the position of supervisor. He also did nothing to see that the law school rule was enforced against Mr. Ballard.

25. By March or April, 1976, it was rumored throughout Liberty Mutual's Houston office that Mr. Ballard was going to law school. He was not, however, questioned about his law school attendance.

[Finding 26 quotes a letter from the EEOC asking Liberty Mutual to explain the fact that one of its male adjusters was attending law school and a letter from Liberty Mutual declining to explain or investigate until told the name of that adjuster.]

27. In May, 1977, Ms. Shirley Cole was promoted to the position of supervisor. She and Mr. Ballard were still dating. Ms. Cole took no action to see that the law school rule was enforced in regard to Mr. Ballard.

28. On November 29, 1977, counsel for plaintiff Chescheir mailed a set of interrogatories to counsel for the defendant. Interrogatory No. 13 asked whether Mr. James Ballard had ever attended law school while classified as an adjuster. One and a half months later, on January 12, 1978, Mr. Wells, Southwest Division Claims Manager, called Mr. Larry Ogletree, then Houston Claim Manager, and instructed him to ask Mr. Ballard whether he had attended law school and to discharge him if he admitted having done so. When Mr. Ogletree questioned Mr. Ballard, Mr. Ballard said that he was attending law school, that it was currently between semesters, and that he intended to return to school when the new semester began. Mr. Ballard was, at that time, fired.

29. The defendant acknowledges that Mr. McCarthy, Mr. White, and Mr. Ballard went to law school while working as adjusters and, in Mr. Ballard's case, a first-year supervisor. *Defendant's Post-Trial Brief,* at 29. It explains its failure to investigate the rumors of their law school attendance as follows:

> The Company does not use Gestapo-type techniques to uncover these rule-breakers. It does not search people's belongings for law books and it does not conduct wholesale interrogations.

*Id.* It similarly accounts for its unwillingness to determine which male employee was referred to in Mr. Kramer's letter of April 7, 1977. *See* Finding of Fact 26. "[T]he Company," the defendant says in its post-trial brief, at 55–56, "hires high caliber individuals, respects them and treats them as professionals, and is not in the habit of conducting witch hunts."

30. There is some question as to whether this explanation, if it were an accurate description of Liberty Mutual's conduct, would be acceptable. It is not, however, an accurate description of Liberty Mutual's

conduct. One individual was interrogated by Liberty Mutual: Ms. Sue Smith. Ms. Smith was an adjuster in the defendant's Houston office from November, 1974, to October, 1976. When plaintiff Chescheir was terminated, on August 27, 1976, *see* Finding of Fact 6, the defendant did not question Mr. Ballard about his law school attendance, despite the fact that it was rumored throughout the office that Mr. Ballard was going to law school. It did, however, question Ms. Smith. Within a week of plaintiff Chescheir's termination, Ms. Smith was questioned both by Ms. Carolyn Bailey, a supervisor in the Houston office, and by Mr. Wyatt Trainer, Claims Manager of the Houston office, as to whether she was in law school or intending to attend law school. The defendant gave no explanation for this activity. It did not even allege that it was "rumored" that Ms. Smith was attending law school. Ms. Smith, it appears, was suitable for questioning because she is a woman.

31. The defendant knew that two females, plaintiffs Chescheir and O'Connell, were attending law school in violation of the law school rule. It terminated their employment. It also knew that three males, Mr. McCarthy, Mr. White, and Mr. Ballard, were attending law school in violation of the law school rule. It did not terminate their employment. In fact, the defendant transferred Mr. White from Fort Worth to Houston to enable him to go to law school. Finally, despite the rumors of Mr. McCarthy's law school attendance, the rumors of Mr. Ballard's law school attendance, and the receipt of a letter from the EEOC indicating that a male adjuster at Liberty Mutual was attending law school, the defendant did not question a single male employee as to whether he was attending law school. It did, however, when it learned that one female adjuster, plaintiff Chescheir, was attending law school, immediately question another female adjuster, Ms. Sue Smith, as to whether she was attending law school or even contemplating attending law school.

32. The defendant applied its law school rule differently to male and female employees. It offered no justification for the disparate treatment. That being so, it discriminated on the basis of sex against both plaintiff O'Connell and plaintiff Chescheir in violation of 42 U.S.C. § 2000e–2(a)(1).
*O'Connell v. Liberty Mutual Insurance Co.,* 499 F.Supp. 313, 314–20 (S.D.Tex.1980).

### B. Proceedings Below

Chescheir and O'Connell both filed complaints with the E.E.O.C., which issued both a Notice of Right to Sue Within Ninety Days. Within ninety days both filed suit in the federal district court for the Southern District of Texas. The two actions were consolidated and the district court bifurcated trial on liability and damages. After a lengthy bench trial the district court entered the findings of fact, from which we have quoted, and conclusions of law holding Liberty Mutual liable for violation of Title VII.

The court subsequently heard evidence on damages and awarded back pay, reduced by interim wages. Chescheir's back pay period continued until Chescheir acquired legal employment after taking the Texas bar exam. O'Connell obtained an award of back pay for a period that ran through the date of judgment, reduced by interim wages and amounts the court found she could have earned through the exercise of reasonable diligence. The court also awarded attorneys' fees pursuant to 42 U.S.C. § 2000e–5(a) (1976), after considering the guidelines of *Johnson v. Georgia Highway Express,* 488 F.2d 714 (5th Cir.1974). This appeal follows.

### C. Issues on Appeal

The primary issue on appeal is whether the district court's finding of discrimination is clearly erroneous. Liberty Mutual basically argues that it applied the law school rule uniformly to all adjustors and supervisors that it knew were attending law school. The company claims that the court's findings that it knew the three male employees were attending law school are clearly erroneous. It also argues that O'Connell's and Chescheir's back pay awards should have terminated when they graduated from law

school. Finally, Liberty Mutual disagrees with the hourly charge awarded to two of the attorneys. We shall treat these arguments in turn.

## II. LIBERTY'S LIABILITY.

### A. Legal Issues

■■■ Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–2 (1976) provides:

> (a) It shall be an unlawful employment practice for an employer—
>> (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges or employment because of such individual's race, color, religion, sex, or national origin;

This provision applies not only to the more blatant forms of discrimination, but also to subtler forms, such as discriminatory enforcement of work rules.

In *Brown v. A.J. Gerrard Mfg. Co.,* 643 F.2d 273, 276 (5th Cir.1981), we set out a four part test for demonstrating a prima facie case for discriminatory discharge due to unequal imposition of discipline:

(1) That plaintiff was a member of a protected group;

(2) That there was a company policy or practice concerning the activity for which he or she was discharged;

(3) That non-minority employees either were given the benefit of a lenient company practice or were not held to compliance with a strict company policy; and

(4) That the minority employee was disciplined either without the application of a lenient policy, or in conformity with the strict one.

*Id.* at 276.

*E.E.O.C. v. Brown & Root, Inc.,* 688 F.2d 338, 340–41 (5th Cir.1982). Of course, if an employer is unaware that a nonminority employee is in violation of company policy, the absence of discipline does not demonstrate a more lenient policy. It follows from this that if an employer applies a rule differently to people it believes are differ-

ently situated, no discriminatory intent has been shown. *See, e.g., Turner v. Texas Instruments, Inc.,* 555 F.2d 1251, 1256–57 (5th Cir.1977).

The parties to this lawsuit do not dispute these legal principles. Instead, they dispute the district court's factual findings underlying the legal conclusion of liability.

Findings of fact by the district court will not be disturbed unless clearly erroneous. F.R.Civ.P. 52(a); *see Chisholm v. Sabine Towing & Transportation Co.,* 679 F.2d 60 (5th Cir.1982); *Sebree v. United States,* 567 F.2d 292, 293–94 (5th Cir. 1978). A finding is clearly erroneous "when although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been committed." *United States v. United States Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948). *Ferrero v. United States,* 603 F.2d 510, 512 (5th Cir. 1979).

*Verrett v. McDonough Marine Service,* 705 F.2d 1437, 1441 (5th Cir.1983). The district court's findings can be placed in two groups. First, Findings 1–30 state "subsidiary" facts. Findings 31 and 32 state the court's "ultimate" facts.

■ In reviewing the district court's findings, we are mindful of the Supreme Court's admonitions in *Pullman Standard v. Swint,* 456 U.S. 273, 102 S.Ct. 1781, 72 L.Ed.2d 66 (1982).

> [Fed.R.Civ.P.] 52 broadly requires that findings of fact not be set aside unless clearly erroneous. It does not make exceptions or purport to exclude certain categories of factual findings from the obligation of a Court of Appeals to accept a district court's findings unless clearly erroneous. It does not divide facts into categories; in particular, it does not divide findings of fact into those that deal with "ultimate" and those that deal with "subsidiary" facts.

*Id.* 102 S.Ct. at 1789. Thus, our task is to determine whether, based upon all of the evidence, we are left with a definite and firm conviction that the district court made

a mistake in finding that Liberty Mutual applied its law school rule differently to male and female employees.

### B.  Discriminatory Application:  Fact or Fiction?

The district court made multitudinous findings of subsidiary facts and concluded in a finding of ultimate fact: "The defendant applied its law school rule differently to male and female employees." Under *Pullman-Standard, supra,* unless that ultimate finding is clearly erroneous, we must affirm the legal conclusion of liability. The subsidiary facts detail a plethora of individual instances that each tend to suggest discrimination. Rather than being a single chain, the weakest link of which Liberty Mutual could attack, the subsidiary facts are many threads woven into a strong cord supporting the ultimate finding of discrimination. Liberty Mutual, as it must, attacks each and every thread. However, not many of those threads need remain intact to support the ultimate finding. Rather than enumerating every subsidiary fact and determining whether or not it is clearly erroneous, we need look only until we find enough strands to satisfy *United States Gypsum, Pullman-Standard,* and *A.J. Gerrard.*

We must review the district court's ultimate finding of discrimination in terms of the four-part test of *A.J. Gerrard, supra.* It is clear that the plaintiffs are members of a protected group and that there was a company policy or practice concerning the activity for which the plaintiffs were discharged; thus the first two elements of the test are met. It is also clear that minority employees were disciplined without the application of a lenient policy, and in conformity with a strict policy. All women known to violate the law school rule were immediately discharged. Furthermore, even potential violations of the rule by women were investigated promptly. An anonymous letter was sufficient to trigger an investigation of Chescheir, and the fact that Chescheir was attending law school moved the company to interrogate another woman.

The only remaining element of the prima facie case under *A.J. Gerrard* is a finding that male employees either were given the benefit of a lenient company practice or were not held to compliance with a strict company policy. This is the element upon which Liberty Mutual focuses its attack. Recasting Liberty Mutual's argument slightly, it claims that other males were strictly disciplined in accord with the law school rule, and that Liberty Mutual never knew that McCarthy, White, and Ballard were attending law school. Thus, claims Liberty Mutual, the third *A.J. Gerrard* element was not met.

■ We are not persuaded. First, our review of the record does not disclose *any* males in the Southwest Division who were discharged because of the law school rule.[1] Second, even were we to accept Liberty Mutual's contention that it did not actually know McCarthy, White, and Ballard were attending law school, we would still affirm the judgment. Under *A.J. Gerrard*'s third element, the operative question is merely whether Liberty Mutual applied a more liberal standard to male employees. The district court found that there were widespread rumors that McCarthy and Ballard were attending law school. Record at 233, 536, 923. Also, the E.E.O.C. notified Liberty Mutual that a male adjuster was attending law school (Ballard) and requested an explanation. Key managerial employees, at a minimum, suspected McCarthy was attending law school but preferred not to ask and confirm their suspicions. *E.g.,* Record at 233. One male adjustor was told when he was hired that he could attend law school. Record at 287. These factual findings are all fully supported by the record. In contrast to Liberty Mutual's energetic

---

1.  Liberty Mutual claimed that two male adjusters, Murov and Lawless, were in fact discharged. The record, in contrast, discloses letters from them that appear to be voluntary resignations with no reference to the law school rule. *See* Defendant's Exhibits 36 and 38. Thus, we are not persuaded by Liberty Mutual's factual argument that the present instances of discriminatory enforcement were isolated and sporadic. On the contrary, the discriminatory discharges of O'Connell and Chescheir constitute the entire universe of law school rule applications in the Southwest Division.

investigation of women it believed might be attending law school, Liberty Mutual never investigated any of these allegations, suspicions, or rumors about male adjustors. The case of Mr. White is even more dramatic. After he expressed a desire to transfer to Houston in order to attend law school, that transfer was granted and he was never told he could not attend law school. Record at 650, 831, 836.

These preceding facts are more than enough to support the third leg of *A.J. Gerrard*—males at Liberty Mutual were subject to lenient enforcement of the law school rule. The district court's ultimate finding of fact—that Liberty Mutual applied its law school rule discriminatorily—finds firm support in the record; all four elements of the prima facie case as enunciated by *A.J. Gerrard* are present. Reviewing this ultimate finding under the clearly erroneous standard, as we must under *Pullman-Standard,* we most certainly are not left with a definite and firm conviction that a mistake has been committed.

Once Chescheir and O'Connell established a prima facie case of discrimination, the burden shifted to Liberty Mutual to present a justification. *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *Chaline v. KCOH, Inc.,* 693 F.2d 477, 479 (5th Cir.1982). The district court found that Liberty Mutual offered no justification. Liberty Mutual does not seriously dispute that finding nor do we find it to be clearly erroneous. Accordingly, we affirm Liberty Mutual's liability under Title VII.

## III. DAMAGES AND ATTORNEYS' FEES

Liberty Mutual raises two other factual arguments contesting the quanta of damages and attorneys' fees awarded Chescheir and O'Connell. The district court determined that the relevant period for computing back pay for Chescheir should terminate when she began work as an attorney in a law firm in September 1978. Similarly, the trial court terminated O'Connell's back pay period as of entry of final judgment, August 10, 1982. Liberty Mutual argues that the back pay period should have terminated when Chescheir and O'Connell graduated from law school, in May of 1978 and May of 1982, respectively.

The determination of the back pay period is a factual matter to be set aside only when clearly erroneous. *See, e.g., Welch v. University of Texas,* 659 F.2d 531, 535 (5th Cir.1981). Though it is arguable that Chescheir and O'Connell abandoned the insurance industry when they graduated from law school, it seems at least as plausible that they did not abandon the industry until they acquired legal employment. With particular regard to Chescheir, the district court rejected Liberty Mutual's argument:

> The Court does not accept defendant's argument that Chescheir's back pay period should terminate in May, 1978. The evidence demonstrated that after Ms. Chescheir graduated from law school, in May, 1978, she continued to work for the same employer she worked for while in law school until she joined the law firm.

Memorandum and Order of June 21, 1982, at 25 n. 9. We cannot say the district court's determination of the back pay periods were clearly erroneous.[2]

In awarding attorneys' fees the trial court made a thorough and complete consideration of the factors specified in *Johnson v. Georgia Highway Express,* 488 F.2d 714 (5th Cir.1974). Liberty Mutual's sole complaint is that the hourly rate for trial work awarded to two of Chescheir's attorneys was excessive.[3]

"The district court has broad discretion in awarding attorney fees; the amount will be altered only in the event of a clear showing of abuse of discretion. *Cappel v. Adams,* 434 F.2d 1278, 1280 (5th Cir.1970)." *Welch, supra,* 659 F.2d at 535. We find no clear

---

2. O'Connell argues that her back pay award was insufficient. Because O'Connell filed no cross-appeal, we may not consider her argument.

3. Dixie was awarded $150 per trial hour and Schulman was awarded $70 per trial hour.

showing of abuse of the trial court's broad discretion. On the contrary, we find ample support for the hourly rates in the trial court's evaluation of the *Johnson* factors. *See* Memorandum and Order of June 21, 1982, at 15–20.

## CONCLUSION

We have threaded our way through the entire record and find that the thread is not so coarse, uneven, or fragile as not to go through the *Pullman-Standard v. Swint* fabric of decision. The trial court loom was staunch and taut and its findings of fact come within the patina of clearly erroneous rule. In fact, we are left with no doubt that the company had a double standard and that the complainants sustained attendant damages. This case was skillfully tried and all of the facts exhumed; the trial court's analysis was in accordance with a high standard of judicial practice and one that completely complied with a *Pullman-Standard v. Swint* measurement of what constitutes findings of fact that can withstand the briefing onslaught of a losing party. Accordingly, the judgment of the district court is

AFFIRMED.