Connie ZENTISKA, Plaintiff,

v.

The POOLER MOTEL, LTD.,
Defendant.

No. CV488–47.

United States District Court,
S.D. Georgia,
Savannah Division.

Nov. 21, 1988.

Elizabeth F. Bunce, Savannah, Ga., for plaintiff.

G. Terry Jackson, Savannah, Ga., Orval E. Fields, II, Columbus, Ohio, Charles C. Grile, Savannah, Ga., for defendant.

### ORDER

EDENFIELD, District Judge.

This Title VII action was tried before the Court on October 19, 1988. Plaintiff Connie Zentiska, formerly Connie Cribbs, alleges that her employer, defendant The Pooler Motel, Ltd., subjected her to sex discrimination, and engaged in a continuing pattern

See also 708 F.Supp. 1318.

of sex discrimination. Having heard the testimony of the witnesses and the arguments of counsel, and having reviewed the exhibits, the Court makes the following findings of fact and conclusions of law. To the extent that any findings of fact constitute conclusions of law, they are adopted as such. To the extent that any conclusions of law constitute findings of fact, they are so adopted.

### FINDINGS OF FACT

1. Defendant Pooler Motel is a limited partnership formed to build and manage Knights Inn Motel in Pooler, Georgia. Cardinal Industries is an Ohio corporation doing business in Pooler, Georgia as Knights Inn.

2. Knights Inn hires employees to serve as Guest Service Managers. Guest Service Managers are hourly employees whose duties include checking guests into and out of the motel.

3. On April 21, 1986, plaintiff Connie Zentiska, a white female, interviewed at the Knights Inn in Pooler for a position as Guest Service Manager. Three Knights Inn employees, Robert Appell, Donna Appell, and the Pooler Knights Inn Innkeeper Steve Zentiska, interviewed plaintiff.

4. Plaintiff and the others interviewing for Guest Service Manager positions were asked three questions: (1) Are there any days of the week you can't work? (2) Are there any hours you can't work? (3) Do you have reliable transportation? These questions were designed to determine whether the interviewee would be a flexible employee who would be available to fill the needs of the motel.

5. During her interview, plaintiff responded that she had reliable transportation, and that she could work any days or any hours. She indicated, however, that she preferred day hours because she picked her children up at a day care center at 6:15 p.m.

6. Knights Inn operates on four shifts. Plaintiff expressed a desire to work the 12:00 a.m. to 6:00 p.m. shift. This shift is regarded as the easiest because few guests check in or out during that time.

7. Following the interview, Steve Zentiska called plaintiff to offer her a position as a Guest Service Manager. He told her that she would be scheduled to work the 12:00 a.m. to 6:00 p.m. shift. Plaintiff believed that this would be a permanent, or non-rotating, shift.

8. At the same time that plaintiff was hired, defendant also hired Virginia Best to serve as a Guest Service Manager. Best was not promised any hours when she was hired, but she usually worked the 6:00 a.m. to 12:00 a.m. shift. She understood that Knights Inn employees needed to be flexible and that they were required to work whatever shift was assigned to them.

9. Plaintiff accepted her job offer with Knights Inn. Shortly after being hired, plaintiff received and read the Knights Inn Employee Handbook. The Handbook states that the demands of the business will determine an employee's work schedule.

10. As Innkeeper, Steve Zentiska wrote the weekly employees' schedule. He regularly scheduled plaintiff to work the 12:00 a.m. to 6:00 p.m. shift.

11. In early July, 1986, Dwight W. Cooke, Knights Inn Area Director, called Steve Zentiska. Cooke asked Steve Zentiska if he was dating a Knights Inn employee. Steve Zentiska replied that he was not dating a Knights Inn employee, although he previously had been dating one. On July 7, 1988, Cooke filed an evaluation of Steve Zentiska. In his evaluation, called a Trip Report, Cooke informed Steve Zentiska that he was not allowed to date employees because it could lead to a lawsuit.

12. Knights Inn had an unwritten policy that supervisors should not date hourly employees. Innkeepers were informed of this policy during their training sessions. Hourly employees, however, were not informed of this policy, and their only means of learning about the policy was hearing it from the Innkeepers.

13. Despite this policy, Cooke dated and eventually married a Knights Inn employ-

ee, Beverly Cooke. At that time, Cooke occupied a managerial position in the operations division of the company, and Beverly Cooke worked in the accounting division as an hourly employee. Cooke was not charged with the direct, daily supervision of Beverly Cooke. Nevertheless, Cooke was in a supervisory position and she was an hourly employee. In addition, they worked in the same building. Neither employee was terminated because of their dating relationship.

14. On several occasions, plaintiff arrived late for work. Steve Zentiska reprimanded plaintiff for her tardiness.

15. In mid-July, plaintiff and Steve Zentiska began dating. About four times, plaintiff spent the night with Steve Zentiska in his Innkeeper's apartment located on the motel premises. Plaintiff was unaware that her relationship with Steve Zentiska was against company policy. He, however, was fully aware that such a relationship violated company policy, and he had been recently warned not to date his employees.

16. On August 25, 1986, Steve Zentiska called plaintiff to tell her that she was being taken off the schedule. He explained to her that he had been ordered to take this action because of their dating relationship. Both plaintiff and Steve Zentiska contend that Cooke ordered Steve Zentiska to take plaintiff off the schedule. In their depositions, they stated that Cooke called Steve Zentiska at the motel on August 28, 1986, and ordered him to remove plaintiff from the schedule. On that day, however, Steve Zentiska was attending a company meeting in Florida. At trial, plaintiff and Steve Zentiska realized that Cooke's alleged phone call could not have occurred on that day. They offered no credible evidence to support their claim that plaintiff was laid off on August 25 because Steve Zentiska had been ordered to do so. The Court finds that Steve Zentiska acted unilaterally.

17. Although Steve Zentiska had taken plaintiff's name off the schedule, he asked plaintiff to work on August 28 because the employee scheduled to work was absent.

18. On September 4, 1986, Cooke called Steve Zentiska to discuss Steve Zentiska's relationship with plaintiff. Steve Zentiska asked Cooke for guidance. Cooke advised him that he could stop dating plaintiff or quit his job but that he should not fire plaintiff. Cooke told Steve Zentiska that it was up to him to decide how to handle the situation.

19. On September 8, Steve Zentiska decided to place plaintiff's name on the schedule again.

20. That same day, Betty Figura, the Knights Inn Area Manager, met with Nancy Russell. Figura offered Russell the position of Innkeeper at the Pooler Knights Inn. Russell agreed to begin right away.

21. Figura then went to the motel and fired Steve Zentiska. She informed him that Russell was replacing him immediately. According to the separation notice, Figura fired Steve Zentiska for three reasons: (1) failing to maintain security of motel funds; (2) failing to maintain control of motel keys; and (3) allowing unauthorized personnel—plaintiff—to occupy the Innkeeper's apartment. It is clear that Steve Zentiska's relationship with plaintiff was a catalyst for defendant's decision to fire him.

22. Upon arrival, Russell altered the weekly work schedule. Russell placed employees on rotating schedules. In addition, she wanted the more experienced employees to work during the more demanding shifts. In accordance with this plan, Russell rescheduled plaintiff. Under Russell's schedule, plaintiff would work a rotating shift that sometimes required her to work 6:00 p.m. to midnight, when more people would check in or out of the motel. The Court credits the testimony of Nancy Russell.

23. Russell did not alter the schedule of Virginia Best, who had been hired at the same time as plaintiff, except that Best usually worked only on weekdays and Russell scheduled Best to work on a Saturday. Russell retained Best on the 6:00 a.m. to 12:00 a.m. shift because Best was experienced enough to meet the demands of a

busy shift. After working one week under Russell, Best quit for unrelated reasons.

24. Upset with the schedule changes, plaintiff telephoned Russell on September 11, 1986. Russell informed plaintiff that she was too busy to discuss the schedule. Nevertheless, plaintiff drove to the motel in an effort to discuss the schedule with Figura and Russell. Figura told plaintiff to leave the premises because she was not authorized to be there. Plaintiff explained that she was there to work the noon shift. Figura responded that plaintiff was not scheduled to work at that time and an argument followed. Figura called the police to remove plaintiff from the premises. Plaintiff left before the police arrived.

25. Having failed to resolve her problems through Innkeeper Russell, plaintiff called Area Director Cooke. When plaintiff recounted to him the argument that had occurred on company property, Cooke informed plaintiff that she was fired for insubordination.

26. On September 18, 1986, plaintiff wrote a letter to Arthur Stiles, president of Cardinal Industries, complaining of the scheduling problems and suggesting that she was being punished because of her relationship with Steve Zentiska. Stiles asked Barbara Yingling, Director of Human Resources, to talk to plaintiff. Plaintiff told Yingling that Knights Inn had treated plaintiff unfairly. Plaintiff requested back pay for the two weeks she had been laid off and reinstatement with a permanent assignment to the 12:00 a.m. to 6:00 p.m. shift. Plaintiff did not specify the amount that she thought would be adequate compensation for the two weeks she was laid off.

27. Yingling inquired about the shifts that Guest Service Managers of the Pooler Knights Inn were working. Russell reported that she was now scheduling her employees to work rotating shifts.

28. On October 20, 1986, Yingling offered plaintiff reinstatement and back pay for 80 hours at four dollars and twenty-five cents an hour. Yingling explained, however, that plaintiff, like Russell's other employees, would be placed on a variable schedule to which she could agree. The Court credits Yingling's testimony that plaintiff was offered reinstatement with a variable schedule. Plaintiff accepted defendant's offer.

29. When plaintiff went to the motel to pick up her check for back pay, Russell told plaintiff that she would first have to sign a waiver form. Yingling had failed to tell plaintiff that she would be required to sign a waiver. Plaintiff wanted time to think about the implications of a waiver, and therefore she took the blank form home with her.

30. Before signing the waiver, plaintiff used a bottle of "white-out" to delete the language saying that she would waive all "claims, demands, actions and causes of action." The altered form stated that in consideration of the back pay received, plaintiff would release defendant from all debts. Plaintiff signed the form without informing Russell that she had altered it.

31. Subsequently, Russell and plaintiff met to discuss scheduling. Russell explained that she was scheduling Guest Service Managers, who were all female, to work rotating shifts. Although plaintiff did not like the proposed schedule, she agreed to work it.

32. Plaintiff failed to appear for any of her shifts, including the 12:00 a.m. to 6:00 p.m. shifts that she preferred. Russell contacted plaintiff to find out why plaintiff had not worked her assigned shifts. Plaintiff said that she had misunderstood the schedule; she thought she was not scheduled to work until the following week. Russell informed plaintiff that she would place plaintiff's name on the following week's schedule. To avoid any confusion, plaintiff was asked to write down her scheduled shifts. Plaintiff again failed to appear for her scheduled shifts.

33. In total, Russell wrote three weeks of schedules with plaintiff's names on them. During this time, plaintiff would have rotated between the 12:00 a.m. to 6:00 p.m. shift and the 6:00 p.m. to 12:00 p.m. shift. Plaintiff failed to show for any of her shifts.

34. When Yingling learned that plaintiff had not worked for three weeks, she told Russell not to place plaintiff's name on the schedule again.

35. Defendant fired plaintiff. According to the separation notice, plaintiff was fired for insubordination and failure to work her scheduled shifts.

36. On November 8, 1986, plaintiff and Steve Zentiska were married.

37. Plaintiff filed a timely claim with the Equal Employment Opportunity Commission.

38. Since August, 1988, plaintiff has been employed at Hipps Video where she earns $650 dollars per month. Between the time she was fired by Knights Inn and the time she obtained her current position, she submitted approximately ten employment applications and earned approximately $740 dollars.

### Conclusions of Law

1. This Court has jurisdiction over plaintiff's Title VII claims under 42 U.S.C. § 2000e–5(f)(3).

2. Plaintiff has satisfied the statutory prerequisites for bringing this action.

3. Defendant is an "employer" within the meaning of 42 U.S.C. § 2000e(b).

4. The issues before the Court are: (1) whether plaintiff was subjected to sex discrimination when she was laid off from work; (2) whether plaintiff was subjected to sexual discrimination or a pattern of sexual discrimination when her schedule was changed and she was ultimately terminated; and (3) what effect the signed waiver form has on defendant's liability, if any.

I. *Was Plaintiff Subjected to Sex Discrimination When She Was Laid Off From Work*

5. Plaintiff alleges that defendant violated Title VII by subjecting her to disparate treatment based on gender; she claims that although other employees dated co-workers, they were not laid off by defendant. Plaintiff states a cause of action because 42 U.S.C. § 2000e–2 "applies not only to more blatant forms of discrimination, but also to subtler forms, such as discriminatory enforcement of work rules." *Chescheir v. Liberty Mutual Insurance Co.*, 713 F.2d 1142, 1148 (5th Cir.1983).

6. Plaintiff must establish a "dissimilarity in treatment between the sexes before [her] allegation of sex discrimination can be upheld." *Stroud v. Delta Air Lines*, 544 F.2d 892, 894 (5th Cir.1977). Plaintiff has demonstrated that she was treated differently from similarly situated males. Although Steve Zentiska and Dwight Cook dated Knights Inn employees, neither was laid off because of it.

7. To establish a *prima facie* case, plaintiff must show "that she applied for an available position for which she was qualified, but was rejected under circumstances which give rise to an inference of unlawful discrimination." *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 253, 101 S.Ct. 1089, 1094, 67 L.Ed.2d 207 (1981). *See also McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).[1] Plaintiff has established a *prima facie* case under this standard.

8. Title VII's definition of employer extends to "any agent of such [employer]." 42 U.S.C. § 2000e(b).

9. Title VII does not define "agent." Courts must look to common law agency principles to determine if a supervisor is an agent for Title VII purposes. *Meritor Savings Bank v. Vinson*, 477 U.S. 57, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986).

10. When Steve Zentiska took plaintiff's name off the work schedule he was acting as an agent of defendant because he "purported to act or speak on behalf of the principal," defendant. Restatement (Second) of Agency, § 219(2)(d). Defendant, therefore, is directly liable for Steve Zentis-

---

1. The Court realizes that being laid off is not the equivalent of being rejected or discharged from employment. Nevertheless, the above test applies to plaintiff's case because the Supreme Court has recognized that this test is flexible; "the facts necessarily will vary in Title VII cases." 411 U.S. at 802, n. 13, 93 S.Ct. at 1824, n. 13.

ka's conduct. *Sparks v. Pilot Freight Carriers, Inc.*, 830 F.2d 1554, 1558 (11th Cir.1987).

11. Once a plaintiff establishes a *prima facie* case of discrimination, the burden shifts to the defendant to articulate a legitimate, non-discriminatory reason for subjecting plaintiff to disparate treatment. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). While a burden of production is imposed on the defendant, the burden of persuasion always remains with the plaintiff. Thus, if the defendant articulates a legitimate non-discriminatory reason for the disparate treatment, plaintiff must prove by a preponderance of evidence that the legitimate reasons offered by defendant were not true reasons, but were a pretext for discrimination. *See Feazell v. Tropicana Products, Inc.*, 819 F.2d 1036, 1039 (11th Cir.1987). Here, defendant failed to articulate a legitimate, non-discriminatory reason for subjecting plaintiff to disparate treatment. Defendant has failed to prove that sex was not a factor in laying plaintiff off from work.

■ 12. Under Georgia law, "an accord and satisfaction obliterates a debt ... and bars any further recourse as to such claims." *Rhone v. State Auto Mutual*, 858 F.2d 1507 (11th Cir.1988) (citations omitted). An accord and satisfaction existed when plaintiff signed the waiver and cashed the check tendered in satisfaction of the dispute over the amount due to her for the time she was taken off the schedule. Plaintiff's unilateral alteration of the waiver form did not preclude a finding of accord and satisfaction. *Rhone v. State Auto Mutual*, 858 F.2d 1507 (11th Cir.1988) (quoting *Hartline–Thomas, Inc. v. H.W. Ivey Construction Co.*, 161 Ga.App. 91, 289 S.E.2d 296 (1982).

13. In sum, the Court finds that plaintiff was subjected to discriminatory treatment when she was taken off the schedule for two weeks, but the Court will award her no damages; the debt was extinguished when plaintiff accepted and cashed defendant's check in satisfaction of the amount due her for being laid off.

## II. Was Plaintiff Subjected to Sex Discrimination Or a Pattern of Sex Discrimination When Her Schedule Was Changed and She Was Terminated

■ 14. Plaintiff has established a "dissimilarity in treatment between the sexes." *Stroud v. Delta Air Lines*, 544 F.2d 892, 894 (5th Cir.1977). Dwight Cooke dated a Knights Inn employee, but defendant did not terminate him or subject him to adverse employment conditions. Cooke, in fact, is still a Knights Inn employee.

15. Plaintiff established a *prima facie* case under the *McDonnell Douglas* standard; plaintiff is a member of a protected class who was qualified for the position she held, and she was discharged.

16. Once a plaintiff establishes a *prima facie* case of discrimination, the burden then shifts to the defendant to articulate a legitimate, non-discriminatory reason for defendant's conduct. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). If the defendant articulates a legitimate non-discriminatory reason for the conduct, plaintiff must prove by a preponderance of evidence that the legitimate reasons offered by defendant were not true reasons, but were a pretext for discrimination. *See Feazell v. Tropicana Products, Inc.*, 819 F.2d 1036, 1039 (11th Cir.1987).

17. Here, defendant has met the burden of proving that its articulated reasons for changing plaintiff's schedule and eventually terminating her are true reasons and not a pretext for discrimination. Defendant established that plaintiff's schedule was altered for the non-discriminatory reasons of efficiency and business necessity; Innkeeper Nancy Russell needed competent employees to cover the busier shifts of 12:00 a.m. to 6:00 p.m. and 6:00 a.m. to 12:00 a.m. Russell scheduled plaintiff and Virginia Best, who had been hired at the same time, to cover these shifts. Similarly, defendant established a legitimate, non-discriminatory reason for firing plaintiff; she was ultimately terminated for insubordination and

for failing to work any of her scheduled shifts.

18.  Plaintiff did not carry the burden of showing that the reasons advanced by defendant are pretextual.  Defendant has successfully demonstrated that its conduct toward plaintiff—changing her schedule and firing her—was based on factors other than sex.

### Conclusion

Based on the foregoing findings of fact and conclusions of law, it is hereby ORDERED that judgment shall be entered in favor of defendant.

SO ORDERED.