Eddie Charles BROWN, etc.,
Plaintiff-Appellant,

v.

A. J. GERRARD MANUFACTURING
CO., Defendant-Appellee.

No. 78–3188.

United States Court of Appeals,
Fifth Circuit.

April 20, 1981.

Robert L. Wiggins, Jr., Birmingham, Ala.,
for plaintiff-appellant.

W. Sherman Rogers, Washington, D. C.,
amicus curiae.

Whitmire, Morton & Coleman, Bryant A.
Whitmire, Birmingham, Ala., for defendant-appellee.

Before GODBOLD, Chief Judge, and SIMPSON and THOMAS A. CLARK, Circuit Judges.

THOMAS A. CLARK, Circuit Judge:

This is an appeal from an employment discrimination case brought under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* The lower court found that plaintiff Brown had failed to rebut the showing by the employer, Gerrard Manufacturing Co., of a legitimate nondiscriminatory basis for his discharge. Because we believe that the lower court erred both in the allocation of the burden of proof and in its evaluation of the evidence in light of the proper allocation of the burden of proof, we reverse.

The facts may be summarized. Brown was hired by the Gerrard Manufacturing Co. on April 26, 1972. About seven weeks later, on June 12, 1972, Brown was injured on the job when a part of the machine he was operating swung loose and hit him on the head. He was taken to a doctor, who certified that Brown might return to work the next day.

Evidently not content with this first diagnosis, Brown returned the next day, not to work, but to the first doctor's partner, under whose care Brown remained for the rest of the time in question. Brown still complained of dizziness and pain, and this second doctor found evidence of a concussion. This doctor excused Brown from work until June 20.[1] He returned to work early, however, working all day on June 19 and part of the next before leaving work again complaining of recurring symptoms.[2]

Brown was later admitted to the hospital, where he stayed from June 27 until July 7, 1972.[3]

When he returned to work on August 14, Brown was told by the plant foreman, John Ward, that he had been "terminated." The termination notice in Brown's personnel file gives as the reason for his discharge his failure to keep the company advised of his status.[4] The effective date of the discharge is given as June 20, the date Brown left work for the second time, and before his admission to the hospital. With the exception of June 20, by which time his doctor had earlier certified that Brown could return to work (and before which time he had already returned to work), at all times from the accident on June 12 until he returned to work on August 14, Brown was under his doctor's certification that he was not yet able to return to work.[5] Most of the testimony at trial concerned the dispute between Brown and the plant manager, Michael Burdyk, over whether Brown had effectively communicated to the company his continuing disability, as well as his intention to return to work.

Some matters, however, were not in dispute. There was no dispute, for instance, that at the time of his discharge the company as yet had no formal policy in the matter of unexcused or unreported absences. Burdyk conceded, however, that the company's invariable practice had been to counsel absentees, advising them that absences had to be reported in advance. In no event would an employee be discharged for the first such unexcused absence, nor would he be terminated without warning.[6]

---

1. Plaintiff's Exhibit 44.

2. Brown testified that he obtained an early certification of fitness, so that he could return to work by June 20, because he was feeling better and because he needed the money. Trial Transcript, 19–20.

3. Defendant's Exhibit 11.

4. Plaintiff's Exhibit 47.

5. Plaintiff's Exhibits 44, 45, and 46.

6. Dep. of Joseph McMahan (Plant Engineer), 75–76. Burdyk's deposition was to the same

effect, Dep. of Burdyk, 107. McMahan's deposition testimony was received into evidence. R., vol. III, 133. The district court did not receive into evidence Burdyk's earlier deposition testimony, basing its decision on F.R.E. 801(d)(2). Since Buydyk's deposition, as his testimony at trial, was taken after his retirement, the court apparently concluded that it failed to qualify as an exception to the hearsay rule as a statement "within the scope of his agency ... made during the existence of the relationship ..." *Id.* But since Burdyk's testimony, both in deposition and at trial, did not consist of statements "*other* than" those of the declarant, Burdyk, offered to prove the truth of

Moreover, plaintiff corroborated the company's own testimony concerning its discharge policy by introducing extensive portions of personnel records of white employees. Most of these incidents postdated Brown's discharge, but they show a consistent pattern of counseling and warning before termination.[7] On at least one occasion, when the company's records showed that telephone calls were not being answered, the personnel file contained a certified mail letter to that effect, together with a warning to respond.[8]

Brown insisted that he had received no warnings that his prolonged disability leave was endangering his job. The company, for its part, presented no evidence suggesting that he had. The company nonetheless insisted that Brown's failure to keep the company advised of his status and of his intentions was sufficient good cause for his discharge.

The lower court viewed the case as a straightforward dispute whether Brown, a black employee, received the benefit of the same company policy regarding unreported absences as did white employees. As the lower court saw it, however, the key issue of fact was not whether Brown had been warned that his absences were endangering his job, but whether Brown had reported his absences to the company.[9] In effect the lower court concluded that Brown was not entitled to any warning, as a matter of company policy, if he did not first prove

that he reported his absences in advance. Therefore, although the lower court appears to have assumed that Brown made out a prima facie case of employment discrimination,[10] actually it concluded that Brown's case did not get that far.

Thus viewing the case, the district court had to determine whether or not Brown ever reported in. Brown testified that he called in many times from the date of the accident until he reported for work on August 14, and that each time he spoke with his superior, John Ward. Ward had moved since the events in question, and did not testify either in person or by deposition. Burdyk in effect was able to testify to no more than that he was unaware of whether Brown had been in touch with Ward or not. Thus, Brown's testimony that he called in about his illness was uncontradicted. Aside from several documents in Brown's personnel file, consisting of letters from lawyers concerning Brown's workmen's compensation claims, medical bills, and management notes concerning visits and calls by Brown, this was all the evidence on the matter. Although the evidence strongly supported inferences both that Brown contacted the company and that the company knew how to contact Brown if it wanted to, the district court found the evidence inconclusive, wished it had more evidence, and then found for the company on the question of whether Brown reported in.[11]

---

the matter asserted, but instead concerned matters within Burdyk's own knowledge, the testimony was not, as a whole, hearsay in the first place. F.R.E. 801(c) (emphasis added). In any event, Burdyk's trial testimony did not contradict that of his own deposition nor that of McMahan.

The company's first formal policy on unreported leave carried forward this practice, at least in part. On February 16, 1973, the company gave written notice that "anyone not reporting off in the future will be subject to a layoff of one day for the first offense and two days for the second. Further disciplinary action would be taken for not reporting off the third time." Plaintiff's Exhibit 57.

**7.** *See, e. g.*, Plaintiff's Exhibits 7, 8, 9, 11, 18, 20 and 27.

**8.** Plaintiff's Exhibit 9.

**9.** R., vol. III, 246–47.

**10.** R., vol. III, 241–42.

**11.** R., vol. III, 250–51:

[THE COURT:] I am not totally satisfied with the evidence. I wish I had heard *more evidence to help me in making this* choice. I am, however, required to make the choice based on the evidence that has been presented to me. I am not reasonably persuaded or satisfied that *Mr. Brown* made the various calls that he said he made during that period from June 20th into August 14th. And for lack of being persuaded, must side with the company's version that there were few, if any, contacts made by Mr. Brown during that period of time. For that reason I am unable to find that the absenteeism standard was ap-

■ We think the lower court erred first of all in its evaluation of what was sufficient to make out a prima facie case. As we have noted, the lower court concluded that Brown never really made out a prima facie case because he failed to carry his burden of proving that he reported in. It was undisputed, however, that absences without prior warning by the employee were precisely the sort of violations of company rules that would not be met by discharge, absent counseling by management and warning of future disciplinary action. Much of plaintiff's evidence was to this effect, and the company never challenged this construction of its own policy.[12] Uncontroverted evidence showed numerous instances in which white employees were given extensive warnings for precisely that: failing to show up for work, for extended periods, without prior notice by the employee. Brown should not, therefore, have been required to prove that he reported his absences on a continuing basis if he were to receive, on a nondiscriminatory basis, the benefit of the company's policy regarding unexcused absences.

■ Under the facts of this case, therefore, Brown made out a prima facie case under Title VII when he offered proof sufficient to find the following: (1) he was a member of a protected group; (2) company policy was not to discharge employees for unexcused absences or absences without prior notice unless the employee had first been counseled and warned; (3) white employees had received the benefit of this lenient company policy; and (4) Brown had been discharged for allegedly unexcused absences without prior warning by the company that his allegedly unexcused absences were endangering his job. *Green v. Armstrong Rubber Co.*, 612 F.2d 967, 968 (5th Cir. 1980) ("With respect to discharge for violation of work rules, the plaintiff must first demonstrate by a preponderance of the evidence either that he did not violate the rule or that, if he did, white employees who

engaged in similar acts were not punished similarly."). *Cf. Harris v. Plastics Manufacturing Co.*, 617 F.2d 438, 440 (5th Cir. 1980) (claims of unequal enforcement of disciplinary rules "refuted by evidence of specific instances in which white employees were disciplined in precisely the same manner as appellants had been.").

■ Apart from any other showing of a legitimate, nondiscriminatory basis for the discharge, none of which was at issue, the company might then have rebutted Brown's prima facie case by proving *either* that its policy was not to discharge only after warning that unexcused absences were endangering one's job, *or* that Brown was so warned and yet he persisted in not reporting his status and intentions. The company's burden on rebuttal would then have been to produce "admissible evidence which would allow the trier of fact rationally to conclude that the employment decision had not been motivated by discriminatory animus." *Texas Dept. of Community Affairs v. Burdine*, —— U.S. ——, ——, 101 S.Ct. 1089, 1096, 67 L.Ed.2d 207 (1981). Even were the employer's burden, however small, not so great, we would still have to reverse the lower court: The employer virtually conceded its first line of rebuttal and offered no evidence along its second.

REVERSED and REMANDED for entry of judgment for plaintiff, after hearing such further evidence as may be necessary to determine damages and attorney fees, if any.

plied in a discriminatory manner, and I therefore rule in favor of the defendant . . .

12. The only automatic terminations were for stealing, fighting on the job, and bringing alcohol into the plant. Dep. of Burdyk, 108.