EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, Plaintiff

v.

CHAS. SCHAEFER SONS, INC., Defendant.

Civ. A. No. 88–1142.

United States District Court, D. New Jersey.

Dec. 22, 1988.

Wanda E. Flowers, E.E.O.C., Philadelphia, Pa., for plaintiff.

Gerald L. Dorf, and Mitchell Dorf, Rahway, N.J., for defendant.

## OPINION

LECHNER, District Judge.

### I. *Introduction*

The Equal Employment Opportunity Commission (the "EEOC" or "plaintiff")) has brought this action pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq. ("Title VII"), on behalf of Billy McDowell ("McDowell"), a former employee of defendant Chas. Schaefer Sons, Inc. (the "Company" or "defendant"). It appears this court has jurisdiction over the parties and the subject matter of this action. The Company is an employer within the meaning of Title VII. McDowell, who is black, asserts that his involuntary separation from the Company constituted disparate treatment in violation of Title VII.

In addition to pretrial conferences, the matter was before the court for decision on the merits following a bench trial held November 7, 9, 10 and 14, 1988. Immediately before commencement of trial and during trial both the EEOC and the Company indicated which paragraphs of opposing counsel's proposed findings of fact were admitted and which were denied. The statement of facts set forth below contains all of the facts which were stipulated to by the parties. These stipulations have been perfected and are properly reflected in the trial record.

The statement of facts contains a number of factual findings (concerning disputed or unresolved factual issues) which I have made upon completion of the bench trial. In addition to considering the facts stipulated by the parties, I have had the opportunity to examine the submissions of the parties and have determined the credibility of the several witnesses after observing their demeanor and considering their relative interests, if any, in this matter. Together with the stipulated facts, my find-

ings are entered as Findings of Fact pursuant to Fed.R.Civ.P. 52(a).[1]

## II. *Statement of Facts*

The Company is a New Jersey corporation doing business in the State of New Jersey and has corporate offices, packaging operations and warehouse facilities located in the Township of Union, Union County, State of New Jersey. The Company is in the business of wholesale distribution and repackaging salt and industrial chemicals.

It is useful to begin with an introduction to the several individuals involved in this case. James Barbour was hired by the Company as Vice President on April 1, 1978 to learn the business and assume general management responsibilities. Barbour was intimately familiar with the finances of the Company and participated in the annual salary review process. He was promoted to Executive Vice President and Chief Operating Officer in 1983 and became President of the Company in December, 1986.

Charles Boeddinghaus was hired by the Company on May 15, 1978 to manage financial matters. His responsibilities included the finance payroll, scheduling, and the hourly workers of the Company. In 1981 Boeddinghaus was promoted to Vice President and Controller of the Company and he became Executive Vice President on January 1, 1987.

F.W. Schaefer, Jr. and Laurence F. Schaefer, formerly President and Vice President of the Company, both retired on December 31, 1986. In December 1986, the Company was sold by F.W. and Laurence Schaefer to Barbour and Boeddinghaus, who remain the current owners of the Company.

Ronald Sepscik was hired on June 20, 1982 and was responsible for the daily operation of the physical plants in Union and Woodbridge, New Jersey and Louisiana. He is still Plant Manager.

McDowell, on whose behalf this action was brought, was hired by the Company on June 10, 1970 as a warehouse employee. He was promoted in 1973 to warehouse supervisor,[2] the position he held prior to the time Barbour and Boeddinghause were hired by the Company and until the time he was terminated. The EEOC stipulated that as warehouse supervisor, McDowell's responsibilities included supervising all of the warehouse department employees when they were not specifically assigned to and performing work for other foremen. In other words, according to the EEOC's stipulations, McDowell was responsible for supervising unassigned warehouse employees even if they were not assigned to perform, or were actually performing, tasks for McDowell.[3] (EEOC Stip., ¶¶ 8, 9)

McDowell was the only foreman who had certain hiring and firing responsibilities with regard to the warehouse department employees. These responsibilities, however, ceased after the Company hired a plant manager. Prior to that time, McDowell hired Charles Alford, John McDowell,

---

**1.** Certain important facts which the EEOC stipulated to are identified by the notation "EEOC Stip.", followed by a paragraph number relating to the actual stipulation. Similarly, certain of the facts stipulated to by the Company are identified by the notation "Co. Stip." and followed by an identifying paragraph number.

I have carefully considered all of the facts stipulated to by the parties and have given them proper weight. Certain of my factual findings—indeed all of them critical to the outcome of this case—are identified as such by the notation "Court Finding."

**2.** The terms supervisor and foreman were used interchangeably by the witnesses during the trial in this matter. These terms are used interchangeably in this opinion because no evidence was introduced to suggest they should have different meanings. Even if different meanings are justified, such difference would not impact upon the ultimate outcome of this decision.

**3.** Based upon the evidence adduced at trial, I find that McDowell had the responsibility for loading and unloading trucks, rotating stock, supervising men assigned to him and general maintenance in the area. After McDowell made assignments to the workers who were working with him, he actually did physical work with them. As discussed further below, I have my doubts as to the extent to which McDowell was responsible for the actions of warehouse employees not under his immediate supervision. Nevertheless, this fact is not crucial because of the unequal application of discipline to McDowell.

Robert Dempsey, Mario Joassaint, Richard Williams and Lonnie Murphy as warehouse department employees of the Company. These individuals, together with Clarence Jackson, are sometimes referred to herein as the "Seven Warehouse Employees." Robert Dempsey and John McDowell are both cousins of McDowell. It appears that McDowell was friendly with these men.

When Barbour joined the Company, McDowell was receiving a salary that was at least equal to or somewhat greater than the other foreman at the Plant site. According to the EEOC's stipulations, and as Barbour testified, after he arrived, Barbour reviewed the relative salaries and responsibilities of the foremen and concluded McDowell had greater responsibilities than the other foremen. These responsibilities included making work assignments for all warehouse department employees at the Plant site throughout the course of the work day, supervising all such workers when they were not specifically assigned to and performing work for other foremen, and hiring and firing warehouse department employees. (EEOC Stip., ¶ 13)

Barbour maintains that based upon these extra responsibilities, he recommended to F.W. Schaefer, Jr. that, starting with the 1979 pay adjustments, McDowell receive certain raises which would result in his being paid substantially more than the other foremen.[4] F.W. Schaefer, Jr. accepted Barbour's recommendations that McDowell receive these raises and the first raise was effective in 1979. The EEOC stipulated that although Schaefer gave his final approval, it was Barbour who recommended that McDowell receive "substantially" more money than the other foremen. (EEOC Stip., ¶ 14)

Set forth below are financial data taken from a chart prepared by the Company which give the compensation history for McDowell and another foreman, Charles Magee, at the Company.

|  | Salary History | | Salary Increase as of May 1st | | Bonuses | |
|  | McDowell | Magee | McDowell | Magee | McDowell | Magee |
|---|---|---|---|---|---|---|
| 1975 | 11,000.00 | — | 1,500.00 | — | $1,200.00 | — |
| 1976 | 12,500.00 | — | 1,500.00 | — | 2,000.00 | — |
| 1977 | 14,000.00 | 12,283.00 | 1,500.00 | 1,717.00 | 2,000.00 | 700.00 |
| 1978 | 15,500.00 | 14,000.00 | 1,500.00 | 1,500.00 | 2,000.00 | 1,000.00 |
| 1979 | 17,000.00 | 15,500.00 | 3,000.00 | 1,500.00 | 2,000.00 | 1,000.00 |
| 1980 | 20,000.00 | 17,000.00 | 3,000.00 | 2,500.00 | 2,000.00 | 2,000.00 |
| 1981 | 23,000.00 | 19,500.00 | 2,000.00 | 2,500.00 | 2,000.00 | 2,000.00 |
| 1982 | 25,000.00 | 22,000.00 | 2,500.00 | 2,500.00 | 2,000.00 | 2,000.00 |
| 1983 | 27,500.00 | 24,500.00 | 1,000.00 | 1,750.00 | 1,500.00 | 1,500.00 |
| 1984 | 28,500.00 | 26,250.00 | — | — | 1,500.00 | 1,500.00 |

The Company also provided McDowell other benefits in addition to his salary. The Company gave McDowell interest-free loans on a number of occasions. In addition, in May 1983, the Company sold a 1979 Chevrolet Caprice to McDowell for $700, a price below the car's market value. McDowell paid $100 as a down payment and the Company agreed to finance the $600 balance. As far as the loans to McDowell are concerned, it was established during trial that other employees at the Company also received loans but these loans were discontinued when they became too onerous for the Company.

The Seven Warehouse Employees operated frontend loaders and forklifts during the period that McDowell was warehouse supervisor. Three other individuals, Arthur Rison, Cleveland Butler and Roger

---

4. Although the EEOC has apparently agreed to this stipulation, the evidence adduced at trial (and discussed in detail below) has caused me to conclude that initially McDowell was paid more money because he did more work not because he had more supervisory responsibilities. However, as is pointed out later in this opinion, McDowell was not in fact paid substantially more money for his efforts.

Porcher, were also classified as warehouse department employees during this period. These ten warehouse department employees, all black, were represented by a union and constituted a bargaining unit at the time that the Seven Warehouse Employees were terminated by the Company.

In 1984, the Company received information causing it to believe that some of its product inventory was being stolen and further that one or more of its employees might be involved. In response to this perceived problem, the Company took various actions, including hiring security guards, installing better locks on the doors at the plant site, installing gates on the front driveway, alerting foremen as to the problem, and instituting tighter inventory controls on packaging items which were ordinarily not subject to inventory controls.

After the implementation of these security measures to protect against product theft, the Company received additional information causing it to believe that packaging items were also being stolen by one or more of its employees. Based upon this information, the Company concluded the security measures already taken were insufficient to prevent theft. Accordingly, the Company decided to implement the additional security measure of hiring an agency to conduct an undercover investigation. The Company contacted several agencies regarding the possibility of providing an undercover investigator at the Company Plant site. After receiving bids from these agencies, the Company hired Wackenhut Security, Inc. Wackenhut deployed Agent Richard Stancil, a black male, to commence the investigation on January 28, 1985. The investigation was completed on March 25, 1985.

Stancil prepared nine reports of his observations at the Company Plant site in Union, New Jersey during his undercover investigation, copies of which were provided to the Company. In his reports, Stancil recounts numerous incidents in which certain warehouse department employees of the Company engaged in specific improper conduct at the Plant site. These reports have been admitted into evidence.[5]

On March 29, 1985, the Seven Warehouse Employees were discharged by the Company because each of them was found to have engaged in one or more improper activities at the Plant site including, but not limited to, the following: (a) use of alcohol and/or drugs on Company time and premises; (b) time card abuse; (c) failure to perform required duties; (d) theft; (e) threatening another employee with a knife. The decision to discharge these individuals was made as a result of the undercover investigation and Stancil's reports. The EEOC stipulated that the decision to discharge these individuals was made without regard to race. (EEOC Stip., ¶ 29)[6]

As indicated above, the Seven Warehouse Employees were represented by a union and were bargaining unit employees. There was a collective bargaining agreement in effect at the time of these terminations which covered these seven employees. This collective bargaining agreement had a grievance procedure which was used by these employees. The summary of their efforts to gain reinstatement would take pages to recite; such a summary is included among the EEOC stipulations which comprise part of the trial record. As relevant here, it is sufficient to note that the Superior Court of New Jersey, Appellate Division, effectively upheld the dismissal of the Seven Warehouse Employees, stating that "[i]t is clear from the record, of course, that [these] employees had in fact violated a [C]ompany rule which expressly stated that 'drinking of alcoholic beverages

5. The reports were not offered to prove the truth of the statements in the reports but rather to offer support for the Company's asserted reason for terminating McDowell—his ineffectiveness and failure as a supervisor to effectively control and lead the men in his supervision.

6. Although the EEOC has stipulated to this—and indeed virtually all of the indicated findings of

fact proposed by the Company—I have a serious question as to whether this decision to terminate was made without regard to race, especially in light of the comment made by Barbour concerning the intellectual capabilities of the warehousemen, all of whom are black. Nevertheless, this stipulation is accepted for purposes of this litigation.

on the premises shall be cause for discharge.' " D–27 at 11.

McDowell was dismissed from employment with the Company effective April 8, 1985, supposedly for failure to perform his assigned duties. The firing of McDowell occurred about a week after the seven warehousemen were terminated. The delay of a week from the termination of the seven warehousemen to the termination of McDowell was not explained.

Four officers of the Company, the two Schaefers, Barbour and Boeddinghaus, participated in the decision to terminate McDowell.[7] (EEOC Stip., ¶¶ 30, 32) This asserted failure to perform assigned duties involved McDowell's alleged failure to properly supervise the Seven Warehouse Employees during the periods of time when they engaged in improper activities for which they were discharged. According to the EEOC's stipulations, the decision to discharge McDowell was made as a result of the undercover investigation and Stancil's reports. (EEOC Stip., ¶ 30.) This EEOC stipulation, however, does not reveal the complete story. There exist a number of facts which establish that the Company's decision to terminate McDowell related to his race more than his asserted responsibility for the Seven Warehouse Employees.

The EEOC argues that it believes that Barbour does not think that blacks are "competent." The EEOC is unable, however, to point to or identify with specificity any incident(s) which support this belief.[8] McDowell did testify generally that there were occasions when Barbour made comments about or criticized the work of the black warehouse employees, without specifically referring to the race of these employees.

During the time relevant to this matter the following were the foremen/supervisors or assistant foremen: McDowell—warehouse supervisor since 1975 (black); George W. Bonasch—foreman since 1975 (white); Charles W. Magee—packaging foreman since 1977 (white); Calvin L. Pretlow—assistant foreman since January 17, 1985, foreman since May, 1985 (black); Kevin J. McCusker—assistant foreman January 15, 1984, warehouse foreman since April 9, 1985 (white); and Joseph L. Karalewich—maintenance foreman since June 25, 1984, plant superintendent since January, 1987 (white).

McCusker was in charge of the Lehigh facility which is located about a mile from the Union plant. McCusker was promoted from assistant foreman to McDowell's foreman position on April 9, 1985, the day after McDowell was fired. The following discussion of the work activities and procedures at the Company establishes McDowell was treated uniquely for the employee misconduct on the part of the Seven Warehouse Employees. This unique treatment resulted in a vacancy in McDowell's position which the Company filled by promoting McCusker.

Warehouse employees were required to report to the lunchroom/shack each morning to form a pool from which the various supervisors and assistant supervisors would draw workers for the day. All of the foremen and assistant foremen would meet and decide which men would be assigned to certain jobs. Conferences among the foremen and assistant foremen in which warehouse employees were allocated to specific tasks would occur only in the morning; if workers went back to the lunchroom/shack after completing a job, they were then available for any foreman or assistant foreman who needed additional further assistance that day.

---

7. These four also participated in the decision to terminate the Seven Warehouse Employees. Although Schaefer, Boeddinghaus and Barbour all testified that race did not play a part with regard to the dismissal of the seven warehousemen or the dismissal of McDowell, I find it did play a substantial part in the decision to terminate McDowell.

8. The EEOC's chief witness, McDowell, "has only been able to identify a single, vague, allegedly overheard conversation, the time, date and context of which he does not know, during which Barbour allegedly referred to the ten bargaining unit warehouse department employees, who all just happened to be black, as "they" or "them" in criticizing their work." (EEOC Stip., ¶ 34)

McDowell was responsible for all warehouses at the Union location; however, all foremen and assistant foremen were responsible for the workers assigned to them for the day. (Court Finding) For example, if Magee was supervising the storage of product in a warehouse, he would be responsible for the men working in the warehouse and for the work done at that time.

Sometimes foremen and assistant foremen would inform McDowell when they would enlist warehouse employees from the general pool, as a courtesy to allow for not only equitable, but also efficent, use of the workers available. (Court Finding) Although McDowell generally knew where various employees were at any given time, he could only be responsible in reality for those workers who were actually working for him at the time. It was not possible for McDowell to supervise workers who were assigned to other foremen. (Court Finding)

Clarence Jackson, one of the Seven Warehouse Employees fired by the Company, was employed from 1967 to 1985 and provides an example of employee misconduct over which McDowell had little or no control. He was a yard man in 1985 and unloaded calcium and rock salt and switched cars around. Jackson testified that Magee helped him perform his duties and that Magee was his supervisor in 1985. McDowell never gave Jackson supervisory direction because this was done by Magee. (Court Finding)

In addition, John McDowell, another of the Seven Warehouse Employees and a cousin of McDowell, was employed at the Company from 1974 to 1985. In 1985 John McDowell worked primarily as a forklift operator at the Lehigh Avenue warehouse under the supervision of McCusker; McCusker would occasionally throw bags of rock salt on the forklift for John McDowell, but he mostly supervised him. When he was not at the Lehigh Avenue plant John McDowell worked for and was supervised by McDowell, pursuant to the "general pool" system explained above. (Court Finding)

Richard Williams was also among the Seven Warehouse Employees and was a five year veteran in the packing department. He provided a general overview of how the lines of responsibility were structured. He testified that Magee was the supervisor in packing; Pretlow was the supervisor for the liquid calcium production; McDowell was the supervisor in the warehouse; and McCusker was the supervisor at the Lehigh Avenue plant.

As to McCusker, a critical player in this case, he was an assistant foreman and spent the majority of his time in 1984 and 1985 at the Lehigh Plant. McCusker testified about a document purportedly signed by him but which he disavows. He testified nonetheless about the substance of the document: there was a conversation between McDowell and Sepscik, the plant manager, during which Sepscik told McDowell he was satisfied that ninety-five percent of McDowell's work was good *for that day* and five percent needed improvement. McCusker emphasized in his testimony the conversation concerned only "that day," not an extended period of time. McCusker's prior deposition testimony, however, contradicts the "one day" aspect of his trial testimony. (Court Finding)

I find McCusker's testimony here and on other topics less than credible. By his demeanor and the way he testified it appeared that McCusker had a bias in favor of the Company, if not a prejudice against McDowell. It appeared in fact that McCusker was "pleading a case" for the Company. This is not surprising in light of the fact that he directly benefitted by McDowell's termination by taking over as warehouse foreman when McDowell was fired.

In contrast to the testimony of McCusker, I found the testimony of Magee quite credible. Magee has been employed by the Company for twelve years as a packaging foreman and has responsibility for the entire packaging operation. Magee testified that every day he would select men who were at the lunchroom/shack and then go to his building and take care of the packing responsibilities for the day.

With the hiring of Sepscik, the Company began to use temporary hirings because it was cost effective. With regard to the assignment of the men, Sepscik would speak with McDowell about the daily manpower needs of the Company. As the plant supervisor, Sepscik, not McDowell, was ultimately responsible for running the plant and allocating Company manpower. (Court Finding)

As to McDowell's termination, Boeddinghaus indicated that he was fired based upon reports received from Stancil. Both Boeddinghaus and Barbour indicated that no independent investigation or verification was made by the Company to corroborate the observations of Stancil. According to Boeddinghaus, the Company simply accepted Stancil's report without verification. McDowell was not permitted an opportunity to defend himself or even offer an explanation before he was fired. (Court Finding)

On the day of his termination, McDowell was advised that F.W. Schaefer, Jr., Boeddinghaus and Barbour wanted to see him in the Company conference room. He was told he was being terminated because of the misconduct of men over whom the management of the Company felt McDowell had the greatest responsibility to supervise.[9]

McDowell protested that he was not being treated fairly and that other foreman were not treated in the same way. Significantly, both Magee and McCusker had responsibility for supervising some of the men who were fired for drinking, using drugs and sleeping on the job. Nevertheless, they were neither fired nor reprimanded. (Court Finding)

McDowell never saw the men drinking, using drugs, sleeping on the job or punching the time cards which belonged to other workers. (Court Finding) Indeed, McDowell's supervisor, Sepscik, never observed several of the warehousemen employed by the Company drinking or using drugs on the job. He did not take part in the decision to terminate McDowell. (Co.Stip., ¶ 2)

McDowell testified that he knew the workers could not have been drinking or using drugs because, based upon his experience, he knew it was not possible to move the heavy bags of salt or move the heavy drums of product safely while under the influence of either drugs or alcohol.[10] Furthermore, based upon his observations, McDowell knew the men over whom he had supervisory authority had not consumed any intoxicant during their workday.

McDowell asked for time to find another job stressing that such courtesies were afforded to other foreman who had been terminated in the past. This request was denied. Finally, after McDowell made numerous applications for employment, he obtained a position in December of 1985 with GAF in Hillside, New Jersey. He started with GAF on December 2, 1985 and has remained there since. (Court Finding)

No reason was given to explain why McDowell was abruptly terminated after more than seventeen years of outstanding employment with the Company other than the asserted reason based upon the observations of Stancil. In this regard, Boeddinghaus admitted he had never observed anyone drinking or using drugs on the premises and was surprised when he heard of the charges. Prior to the undercover operation of Stancil, no managerial employees appeared to be aware of this problem.

Based upon the foregoing, particularly the fact that no other foremen were fired, the inference is compelling that the Compa-

---

**9.** The Company established that most of their hirings were effected by McDowell through his personal contacts with his friends and in his church. It was also established that McDowell was a leader among these men and among the union men.

Once the seven union men were terminated all of whom are black, the Company no longer needed McDowell to "lead" these men. (Court Finding)

**10.** McDowell testified that during his early years with the Company there were instances when he came to work after consuming alcohol or consumed it on the job. He testified he had to punch out and go home because of his physical inability to do his job safely while under the influence of alcohol. There is no evidence even suggesting that, after his initial years with the Company, McDowell consumed any sort of intoxicant while on the job.

ny saw an opportunity to get rid of McDowell and acted upon it. If the stated reason for terminating McDowell was anything other than a pretext, Sepscik, who was in charge of the Plant operations, should have also been held accountable for the employee misconduct.

Yvonne Davis, a paralegal at the EEOC testified she calculated the loss suffered by McDowell as a result of his termination. Based upon the information submitted to her, McDowell experienced a loss of wages for 1985 in the amount of $20,465.81. Computing interest on that figure would bring it to a total of $27,424.44. These numbers have not been disputed in any way by the Company. The EEOC has stipulated that the only period of time for which it is seeking damages for McDowell is the period in 1985 because in 1986 he had obtained a job with GAF which paid him more money than he had been receiving when he was with the Company.

Conclusions of Law

Title VII, as amended by the Equal Employment Opportunity Act of 1972, 42 U.S.C. §§ 2000e to 2000e-17, proscribes employment discrimination on account of race, color, religion, sex and national origin. Title VII affords a remedy for employment discrimination to employees in the private sector.

■ This court is the proper venue to hear the EEOC's claim brought on behalf of McDowell. Title VII claims may be brought in any of the following places: (1) where the unlawful act is alleged to have been committed; (2) where plaintiff would have worked but for the unlawful act; (3) where employment records related to the proscribed conduct are maintained; and (4) where the employer has its principal office (but only if the defendant cannot be brought before the court in any of the three preceding districts). 42 U.S.C. § 2000e-5(f)(3). Most, if not all, of the foregoing tests for venue are met in this case. In connection with its public charge of preventing unlawful employment practices, the EEOC is empowered to bring a civil action against the Company. 42 U.S.C. § 2000e-5(f)(1).

McDowell was clearly an employee within the meaning of Title VII and thus this court has jurisdiction to hear this claim. It appears the Company (having fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year, 42 U.S.C. § 2000e(b)) fits within the broad definition of employer.

■ In a claim of discriminatory treatment under Title VII, courts follow the three-pronged test of *McDonnell Douglas v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *See Gunby v. Pennsylvania Electric Co.*, 840 F.2d 1108, 1115 (3d Cir.1988); *Robinson v. Lehman*, 771 F.2d 772, 777 (3d Cir.1985); *Lewis v. University of Pittsburgh*, 725 F.2d 910 (3d Cir. 1983), *cert. denied*, 469 U.S. 892, 105 S.Ct. 266, 83 L.Ed.2d 202 (1984). Under this test, although the EEOC retains the ultimate burden of persuading the court that McDowell was the victim of racial discrimination, the burden of production may shift between the EEOC and the defendant.

■ The EEOC must satisfy the initial burden of establishing a prima facie case of discrimination. To establish a prima facie case, the EEOC must show that: (i) McDowell was a member of a protected minority; (ii) he was qualified for the job from which he was discharged; (iii) he was in fact discharged; and (iv) after discharge, the Company filled the position with a non-minority.

■ In a disparate treatment case, when a plaintiff produces sufficient evidence to establish a prima facie case, the burden will then shift to the defendant to articulate some legitimate, non-discriminatory reason for the termination. However, the burden of proof remains with the plaintiff who must prove that the reason articulated by the employer was pretextual. *See Gunby, supra*, 840 F.2d at 1115; *Worthy v. United States Steel Corp.*, 616 F.2d 698, 701 (3d Cir.1980).

■ There is no requirement that the introduction of evidence follow the compartmentalized form of the establishment

of a prima facie case, articulation of a legitimate, non-discriminatory reason by the employer and thereafter proof of pretext by the plaintiff. *Worthy*, 616 F.2d at 701.

■ In the context of a discharge for a violation of the employer's work rules, a plaintiff can carry his or her burden of establishing a prima facie case by merely demonstrating that a person not within a protected class was retained under circumstances which resulted in his or her termination. This proposition is not novel.

As stated in *E.E.O.C. v. Brown & Root, Inc.*, 688 F.2d 338, 340 (5th Cir.1982):

> If an employee is discharged under circumstances which an employee of another sex would not have been discharged, an inference of discrimination arises irrespective of the gender of the employee's replacement. Punitive action against employees for violating work rules must not differentiate on the basis of sex or any other criteria reprobated by title VII. *McDonald v. Santa Fe Trail Transportation Co.*, 427 U.S. 273, 282–83 [96 S.Ct. 2574, 2579–80, 49 L.Ed.2d 493] (1976).
>
> In a number of cases, we have held that employees discharged for violation of work rules can establish a prima facie case of unlawful discrimination by showing simply that they were discharged and that a person who did not belong to a minority was retained "under apparently similar circumstances."

*Id.* at 340 (citations omitted).

McDowell asserts his separation from the Company is a violation of Title VII because of discriminatory application of disciplinary sanctions to him and to other foremen or supervisors. In *Brown v. A.J. Garrard Mfg. Co.*, 643 F.2d 273, 276 (5th Cir.1981) a four part test was stated for demonstrating a prima facie case of discriminatory discharge resulting from an unfair imposition of disciplinary sanctions:

(1) That plaintiff was a member of a protected group;

(2) That there was a company policy or practice concerning the activity for which he or she was discharged;

(3) That the non-minority employees either were given the benefit of a lenient company practice or were not held to compliance with a strict company policy; and

(4) That the minority employee was disciplined either without application of a lenient policy, or in conformity with the strict one.

*Id.* at 276.

For the reasons below, I find that the EEOC has made out its prima facie case. Applying the *Brown* critera to this case, it is apparent McDowell is a member of a protected group. Concerning the Company policy, there appears to be a policy which prohibits the use of intoxicants by workmen while they are on company time. It also appears no worker was permitted to take Company property for his own use. It is inferred the duties of a supervisor include prohibiting workmen from consuming intoxicants while on the job and safeguarding Company assets for the benefit of the Company.

With regard to the question whether non-minority employees in this case were given the benefit of a lenient Company practice, or not held to compliance with a strict Company policy, it appears the other foremen (including Bonasch, Magee, McCusker, Karalewich and Sepscik) were not held to compliance with a strict Company policy. They were instead given the benefit of a lenient Company practice.

■ Significantly, only McDowell was held to compliance with strict Company standards. The evidence shows not only that Bonasch, Magee, McCusker, Karalewich and Sepscik were given more lenient treatment, but that they were not even questioned about their possible knowledge of the violations of company rules by the Seven Warehousemen Employees. In addition, actual violations of Company rules by some of these foremen did not result in so much as an inquiry, much more disciplinary action. In short, McDowell was the victim of prohibited discrimination in that disciplinary action was not taken against the non-minority foremen for conduct which oc-

curred "under apparently similar circumstances."

The Company offered certain statistical data to demonstrate a racially balanced workforce in its effort to show the absence of disparate treatment. However, statistics are often unrevealing or unreliable "because company-wide data may mask discrimination on a smaller scale." *Healy v. New York Life Insurance Company*, 860 F.2d 1209, 1218 (3d Cir.1988). The data from the Company supposedly to the effect that it treated McDowell favorably (in that it attempted to increase his salary "substantially" beyond that of other foreman and that it loaned him money and sold a car to him on favorable terms) do not protect the Company from an adverse judgment in this case. As stated in *Healy:* "The Supreme Court has made clear that statistical evidence demonstrating that an employment policy,[11] considered as a whole, is non-discriminatory does not completely insulate employers from disparate treatment suits." *Id.*, at 1218.

The Company has attempted to demonstrate McDowell was paid more than any other foreman. Using only Magee as a specific basis for comparison, it is clear the Company has failed in its efforts. As of April 8, 1985 McDowell was making $28,500. However, Magee on April 8, 1985 was making $26,250. The difference in their salary was $2,250 per year or a mere $43.27 a week. It is also significant to note that McDowell was employed with the Company from June 10, 1970, while Magee commenced employment with the Company on March 1, 1977, almost seven years later. If nothing else, the longevity of McDowell offers substantial basis for the $43 per week difference between the salaries.

Perhaps the best way to demonstrate what can be termed at most a nominal difference between the salaries of McDowell and Magee is to compare their salary histories and bonus payments at the Company. From a review of the salary and bonus histories of these employees set forth in the chart on page 7, the other facts stipulated to or adduced at trial, several facts become apparent.

After ten years with the Company as a foreman, McDowell was making $28,500 a year; after eight years with the Company as a foreman Magee was making $26,250. As indicated in the Company's stipulations and from testimony, Barbour recommended that starting in 1979 McDowell receive certain pay adjustments that "would result in his being paid substantially more than other foreman" ... "to increase the differential between Billy McDowell's salary and that of other foreman." (EEOC Stip., ¶ 14) In 1979 McDowell, after six years with the Company as a foreman,[12] was making $17,000 while Magee, after only two years with the Company as a foreman, was making $15,500. At this time McDowell received a $3,000 increase and a $2,000 bonus while Magee received a $1,500 increase and a $1,000 bonus. The pay raises testified to by Barbour in recognition of the additional work done by McDowell tailed off dramatically in the following years.

Viewed over time, the salary increases paid to McDowell from 1979 through 1984 equalled $11,500 while those paid to Magee equalled $10,750, a total advantage to McDowell of only $750 over a five to six year period. Barbour's testimony that the Company made an effort to pay McDowell substantially more than the other foreman is far from persuasive. With regard to bonuses, other than in 1979 when McDowell received $2,000 and Magee received $1,000, the amounts received by each were exactly the same each year. Accordingly, McDowell received only $1,000 more in bonuses over a five year period than did Magee.

---

11. There were a significant number of black warehousemen. However, the vast majority of these black warehousemen were terminated approximately one week before McDowell was terminated. The so-called statistical balance in the Company's employee profile was reduced dramatically in one fell swoop.

12. McDowell started with the Company as a warehouse employee on June 10, 1970; he was promoted in 1973 to warehouse supervisor.

There is simply no way to accept Barbour's testimony that McDowell was paid more than any other foreman because he worked harder and had more responsibilities. In point of fact, McDowell was paid substantially the same as Magee.

It appears in fact the Company was favoring Magee as far as salaries were concerned, especially in 1983 when he received an increase of $1,750 whereas McDowell received only $1,000. Accordingly, if McDowell was performing the additional work for which he was supposed to receive substantially more compensation than other foreman, the Company's true feelings became apparent as early as 1983. From the very testimony of management, it appears that the Company has demonstrated it was favoring the white foreman, Magee, over its black foreman, McDowell, while acknowledging McDowell was doing much more work than Magee.

The Company also offers statistical data which are supposed to demonstrate a racially balanced workforce and therefore support its position that the termination of McDowell was not race related. At the time McDowell was fired, however, there was only one black assistant foreman, Calvin L. Pretlow. Pretlow's salary history demonstrates he was a warehouseman from July 17, 1974 to November 14, 1982; a forklift operator from November 15, 1982 to January 16, 1985; an assistant foreman from January 17, 1985 to about May, 1985; and from May, 1985 to date, a foreman. Accordingly, Pretlow was not in fact a full foreman at the time McDowell was terminated.

EEOC has demonstrated by overwhelming evidence that McDowell performed on an exemplary basis during his tenure with the Company. If anything, this fact is supported by evidence advanced by the Company, including the document which McCusker testified about, as described above. It was only in 1983, when McDowell's salary increase was half of Magee's, that there was a suggestion the Company might be dissatisfied with McDowell. Even in January, 1984, however, it was indicated to McDowell that ninety-five percent of what he did for the Company was satisfactory.

Under scrutiny, the statistics and other data which the Company has advanced in fact support McDowell's position that he was not treated as the other foremen were treated. Beyond the salary context, his treatment with regard to the violation of Company work rules by the Seven Warehouse Employees is simply inexplicable.

Sepcsik was in charge of the warehouse facilities at Union and Woodbridge, New Jersey, as well as in Louisiana. He was responsible for what occurred at the plants generally and for work production. Sepcsik was senior to McDowell and McDowell reported to him. It is unclear why the Company did not hold Sepcsik responsible for the conduct of the various workmen. Similarly, the record does not reveal why the other foreman for whom these warehousemen were working were not held accountable. Absolutely nothing was offered to establish that McDowell witnessed any, much less all, of the Seven Warehouse Employees breaking company rules.

The Company stated its legitimate, non-discriminatory reason for terminating McDowell was his failure to fulfill his required duties. In support of this, the Company has merely offered the nine reports prepared by Stancil (and testimony of its management employees about the reports) to support its justification for discharging McDowell. It is stressed these reports were not offered to prove the truth of the substance of the reports, but merely to show that the Company was on notice that certain infractions were occurring. In any event, the reports do not state that McDowell was personally aware of any misconduct.

A review of several of these reports seriously undermines the asserted non-discriminatory use of these reports with regard to McDowell. The reports indicated that other foremen, Karalewich and McCusker, were themselves violating Company rules. However, it appears no action, not even the mildest reprimand, was taken with regard to these men, both of whom are white. In addition, there is no indication in the re-

ports (or in the other evidence submitted) that the employees who were violating Company rules were under the supervision of McDowell at that time.

The Company attempts to maneuver around this obvious proof problem by stating that McDowell always had direct supervisory responsibility over the employees when they were not assigned to other foremen. However, the evidence does not indicate, as mentioned, under whose watch the infractions occurred. In fact, on at least one occasion, the reports relied upon by the Company demonstrate that McCusker was in charge of some of the men when infractions had occurred. In addition, it seems he punched the time cards for several of people for whom he was responsible, a clear violation of Company work rules.

Report number 1, covering the period from January 28 to February 3, indicates that on January 31, 1985:

> Agent advises that the majority of his fellow employees appear to be hiding throughout the day to avoid work. Agent also advises employee's Charlie "Googy", Johnny McDowell were drinking beer throughout the day in lunchroom, AKA "The Shack".

D–12, Thursday, January 31, 1985. This report is significant because it indicates a majority of the employees were hiding throughout the day and drinking beer in the lunchroom/shack. The first questions the Company should have asked upon receipt of this report are: To whom were these men assigned? How could they have hidden from all of the foremen throughout the day? What work was completed during the day? Apparently, the Company did not care about these issues. Instead, the Company simply attributed the entire responsibility to McDowell, absolving actual supervisors to whom the rule violating workers were assigned for the day.

On Friday, February 1, 1985, it was reported that there was a discussion of drugs and an attempt to sell drugs to Stancil. This occurred at approximately 12:30, the lunch hour. It was suggested by the Company at trial that McDowell had responsibility for the men during lunch hour because he rarely left the plant premises at that time, whereas Magee always left the premises at the beginning and returned at the end of the lunch period. However, nothing was established to show that McDowell was required to stay on the premises during the lunch period. This appears to be a manufactured reason to hold McDowell accountable for what the men did during their lunch time, albeit on Company premises. Again, no explanation was offered as to why the other supervisors were not held responsible.

On Friday, February 1, 1985, Stancil reported that he observed a non-employee drove onto the Company premises to distribute cocaine. No evidence was offered to suggest, or in any way imply, that McDowell had awareness of this cocaine transaction. It appears the Company did not make even an inquiry of McDowell, or the other supervisors, about this activity.

In report number 2, Stancil stated that on Thursday, February 5, 1985:

> At approximately 2:00 p.m., Agent observed employees Richard Williams, an unidentified temporary, Clarence Jackson, aka "Snake", and Lonnie Murphy drinking beer and smoking marijuana in the lunchroom. Agent advises beer is always stored in the refrigerator in the lunchroom.

D–13, Tuesday, February 5, 1985. Other references to the storage of alcohol in the lunchroom refrigerator were also brought to the attention of the Company. See D–13, Thursday, February 7, 1985. Again, no suggestion has been made that McDowell was aware of the drinking or storage of intoxicants on Company premises. In an attempt to explain why management was never aware, or could never catch, the warehousemen drinking or using drugs on the job, it was stated that there was always a "lookout" who could warn the others to disguise their activities before either Barber or Boeddinghaus approached the lunchroom. However, with knowledge from Stancil that "beer was always stored in the refrigerator in the lunchroom" it is obvious that management could have acted on this fact and confiscated the beer. It is inex-

plicable that only McDowell is charged with the responsibility of failure to supervise in this regard.

In his third report, Stancil noted that on Monday, February 11, 1985, he

... reported to this location at 7:00 a.m. and advises he observed Robert Dempsey punch in Johnny McDowell's time card. Agent notes Johnny did not arrive until approximately 7:20 a.m. At approximately 7:30 a.m., Agent and Billy McDowell proceeded to unload trucks until 1:00 p.m. Agent advises Billy McDowell continued to complaint about Ron checking his work and following him around.

D–14 in evidence. Based upon the inferences drawn from the evidence, the person referred to in this report can be no one other than Ron Sepscik, McDowell's superior at the Company. If Sepscik was following McDowell around, he had to be aware of the same violations for which the Company discharged McDowell. Yet no disciplinary action taken against Sepscik, the white plant manager, for failure to discharge his duties.

Stancil advised the Company that McDowell was in fact effectively looking out for the interests of the Company. McDowell had mentioned to Stancil that, "on Friday [February 15, 1985] he was going to call [a particular] temporary's employment agency and tell them not to send employees back because they had been caught sleeping." D–14, Tuesday, February 12, 1985. This is the same conscientious employee who the Company now charges knowingly permitted fellow employees to consume intoxicants while on the job.

With regard to the disparate, lenient treatment of fellow supervisors, Stancil reported that:

At approximately 2:30 p.m. [on February 12, 1985] Agent overheard security guard inform Billy he caught assistant foreman Joe taking gasoline from the pumps last week but never reported it. The guard informed Billy he has seen this occur on several other occasions.

D–14, Tuesday, February 12, 1985. On the following day, Stancil corroborated the credibility of the information given by the guard to McDowell. Joseph Karalewich is the only foreman with the first name Joe. It appears no disciplinary action was taken against Karalewich, a white foreman, for taking gasoline. Indeed, it appears Karalewich was rewarded for his conduct at the Company, including the taking of gasoline, by a promotion to plant superintendent in January, 1987. See D–2 in evidence. The incident of Karalewich taking gasoline is not an isolated one. As noted by Stancil:

At approximately 2:30 p.m., Agent asked Johnny McDowell why he always sees foreman Joe at the gas pumps. Johnny replied, "Anyone can get gas. My tank is always on full. Billy gets it too. I never have to buy gas." Agent advises both Joe and Billy have keys to the gas pump. Agent asks how he could get gas, and Johnny replied, "You have to be here awhile."

D–14, February 15, 1985. Although this report links McDowell to taking of gasoline, it also establishes that Karalewich is constantly at the gas pump. Yet, as emphasized above, absolutely nothing was done in the way of disciplinary or other action to Karalewich.

The only possible suggestion that McDowell knew of the men drinking while on Company time is contained in the February 26, 1985 report from Stancil where he stated:

At approximately 12:00 p.m., Agent observed Johnny, Sherman, and Charles Alfred (sic) depart to the liquor store and not return until approximately 1:30 p.m. Upon their return, all three went into the shack until approximately 2:45 p.m., and continued drinking. At this time Billy asked Johnny to go outside and stack pallets, and Johnny replied, "I'm too drunk." After approximately fifteen minutes, Agent notes Johnny did go outside to stack pallets.

D–16, Tuesday, February 26, 1985. This report does not establish that McDowell was aware of the drinking at the time but only that when he went to seek Johnny McDowell, Johnny McDowell replied he was too drunk. Again, the critical questions include: Who who was responsible

for the supervision Johnny McDowell at the time? To whom was he assigned earlier in the day? When did he finish his work for that first assignment during the day? This is especially significant in light of the February 28, 1985 report of Stancil.

Stancil reported that on February 28, 1985:

> Agent reported to this location at 7:00 a.m., however, notes there was no work to be completed until approximately 11:00 a.m. Agent advises he socialized in the shack with employees Clarence Jackson, Richard Williams, Robert Dempsey, Johnny McDowell and Sherman Johnson. Agent advises above employees were eating breakfast, and watching t.v. *Agent notes Billy did not work on this date, and Kevin McCarthy was in charge.* At 11:00 a.m., Agent reports Kevin McCarthy instructed Agent and Sherman to clean warehouse, however, Agent advises no conversation occurred between the two.
>
> At approximately 12:30 p.m., Agent entered the shack and Sherman asked him if he wanted to split a pint of Blackberry Brandy. Sherman went to purchase the brandy and returned to shack. At approximately 12:45 p.m., Johnny McDowell entered the shack with two six packs of Budweiser beer for himself, Charles Alford (sic), Richard Williams, Clarence and Sherman. Johnny offered Agent a beer and Agent offered Johnny some Blackberry brandy. Agent advises the drinking continued until approximately 2:30 p.m., at which time Richard Williams advised the employees Kevin McCarthy was coming to the shack, and employees hid all the liquor. Agent notes conversation concerned an upcoming wrestling match in Elizabeth.

D–16, Thursday, February 28, 1985 (emphasis added). This notification clearly points out the disparate treatment to which McDo-

well was subjected. Stancil notes McDowell did not work on February 28, 1985 and that Kevin McCusker[13] was in charge. The conduct of the men for whom McCusker was responsible establishes blatant violations of Company rules: no work was completed until 11:00 o'clock a.m. and the men were drinking. These are the same violations which cost McDowell his job but gained McCusker a promotion—McDowell's position after he was terminated.

On March 20, 1985 Stancil reported on two other apparent failures to discharge duties by McCusker:

> At approximately 11:45 a.m., Johnny departed client's premises to replace the starter in Billy's car. Agent advises Johnny told assistant foreman Kevin that he had worked through lunch and Kevin said he would see that Johnny gets paid for it.
>
> .    .    .    .    .
>
> At approximately 3:45 p.m., Richard Williams, Mario, Charles Alford, Johnny McDowell, and Robert Dempsey departed client's location, and at 4:00 p.m. Kevin punched them out.

D–19, Wednesday, March 20, 1985. It appears McCusker did not discharge his duties appropriately because he merely accepted what Johnny McDowell told him and authorized payment for work through lunch which apparently was not performed. Additionally, there is a strict Company policy preventing one employee from punching another's time card. Stancil reports McCusker did this for five employees. From these reports, the Company was on notice that McCusker committed the same type of misconduct which it alleges McDowell committed. However, instead of being disciplined, McCusker, a white man, was promoted to McDowell's job when McDowell was fired.[14]

Supposedly as a consequence of Stancil's observations, disparately applied to McDo-

---

13. Even though Stancil uses the name Kevin McCarthy, the only foreman or assistant foreman at the Company during this period with the first name of Kevin was Kevin J. McCusker.

14. Yet, on the same date, Stancil reported that McDowell would not accept broken pallets and rejected them because of their condition. Stancil again pointed out McDowell had the Company's best interests in mind when McDowell was doing his job. See D–19, Wednesday, March 20, 1985.

well, Barbour delivered an April 9, 1985 letter to McDowell which stated:

This is to inform you that as of April 8, 1985 you are dismissed from Chas. Schaefer Sons, Inc. for failure to perform assigned duties.

D–21.

Although there is no question that employment decisions may be based upon violations of Company rules without violating Title VII, the significant issue in this case is whether "employees involved in acts against [the Company] of *comparable seriousness* ... were nevertheless retained...." *McDonnell Douglas Corp. v. Green*, 411 U.S. at 804, 93 S.Ct. at 1825 (emphasis added).

The Company did not apply the same standards to other foremen when it was notified these other employees committed similar offenses. In *McDonald v. Santa Fe Trail Transportation Co.*, 427 U.S. at 282–84, 96 S.Ct. at 2579–81, the Court held that an employer would violate Title VII if it discharged a black employee who participated in a theft of cargo while retaining a white employee guilty of the same offense.

Neither Barber nor Boeddinghaus nor anyone else sought to verify any of the information reported by Stancil. They disregarded the information about Karalewich and McCusker. They did not even give McDowell an opportunity to contest the reasons for their discharge. The asserted reason for discharge was nothing more than a pretextual, manufactured statement to terminate a long standing employee and substitute McCusker in his place as warehouse foreman.

I specifically reject the testimony of Boeddinghause, Barber and McCusker as unworthy of credence. All three had an obvious bias: Barber and Boeddinghaus because they own the Company; McCusker because he benefitted from McDowell's termination and "is indebted" to the Company for his promotion to the position which McDowell held. Barber and Boeddinghaus simply chose to ignore the violations of Company rules and policies by the white foremen.

Disparate treatment simply means that on a given occasion or series of occasions an individual in a protected class was treated because of his race less favorably than those individuals not in the protected class. Accepting as essentially correct the Company's contention that there was in fact a valid reason to discharge McDowell, I note that this same reason is equally applicable to McCusker and Karalewich but did not result in their discharge. A finding of racial discrimination is plainly and compellingly justified.

I expressly find from all the evidence in the case that the EEOC has carried its ultimate burden of persuading this Court that the Company's decision to discharge McDowell was more likely than not motivated by McDowell's race. I further find that, although the Company articulated what appeared to be on the surface legitimate, non-discriminatory reasons for the termination, the EEOC established by a preponderance of the credible evidence that the articulated reasons for the discharge of McDowell are in fact pretextual and wholly unworthy of credence. The standards applied to McDowell were not the same standards as those applied to other foreman, especially the white foreman. The reasoning offered by Barber and Boeddinghaus is simply incredible. The EEOC has established a discriminatory discharge resulting from an unfair imposition of disciplinary standards. *Brown*, 643 F.2d at 276.

The EEOC has stipulated that it is seeking only to obtain back pay in the form of damages suffered by McDowell as a result of his wrongful termination. EEOC offered the uncontradicted testimony of Yvonne Davis, a paralegal employed at EEOC, that McDowell experienced a loss of wages in 1985 in an amount totalling $20,465.81. She further established that computing interest on that figure would bring it to a total of $27,424.44. Plaintiff's Exhibit 8 was provided to the Company and available for the cross-examination of Davis. Plaintiff's Exhibit 8 summarizes the interest rates to be applied to back pay and sets forth the calculations. As noted, the Company did not establish or suggest through cross-examination or the introduc-

tion of any other independent evidence that these calculations were in any way inaccurate. Accordingly, judgment will be entered against the Company in the amount of $27,424.44 representing back pay and back interest, together with costs of this suit.

SO ORDERED.